OPINION OF THE COURT
David B. Saxe, J.
A. INTRODUCTION
I have been invited by the plaintiff to journey to, and even beyond, the present boundaries of New York tort law.[1] For the reasons set out in this decision, I cannot accept that invitation.
B. THE FACTS
The essential facts are as follows: The plaintiff, the Forty Exchange Company, a partnership (40 Exchange), was the owner of the land and building known as 40 Exchange Place in the Wall Street section of the Borough of Manhattan in New York City. In January of 1970, 40 Exchange and a law firm, Mendes & Mount, entered into a lease for office space under which Mendes & Mount leased part of the fourth floor and the entire eighth, ninth and tenth floors of 40 Exchange Place. The lease ran for a term of nine years and nine months through April 30, 1980.
During the middle of the lease term, Mendes & Mount began to seek new quarters in midtown Manhattan. At that time (1976), 40 Exchange Place was a 78-year-old building, of awkward shape and in poor condition.
In the latter part of 1976, Mendes & Mount, through its broker, Helmsley-Spear, learned of available office space in a building under construction at 3 Park Avenue, near 34th Street, in Manhattan. A lease between Mendes & Mount, as tenants, and the Three Park Avenue Company (3 Park), as landlord, was negotiated and executed in January of 1977, along with a takeover agreement.
Under the takeover agreement, 3 Park assumed, subject to specified conditions, Mendes & Mount’s rent obligation *477 for the balance of the lease, which was approximately 31 months, at 40 Exchange Place.
On September 30, 1977, Mendes & Mount vacated its space at 40 Exchange Place and moved into 3 Park Avenue. The 3 Park Avenue space offered substantial advantages to Mendes & Mount over the 40 Exchange Place space; it was roomier, in better condition, had more daylight filtering through and contained more storage area than the space at 40 Exchange Place.
In October, 1977, following the receipt of the first rent statement after its relocation to 3 Park Avenue, Mendes & Mount transmitted the rent bill to 3 Park. Mr. Sherman Cohen, a principal of 3 Park, testified that since the rent invoice combined the base rent and the additional rent and because certain user charges were improperly included, he determined that it would be appropriate not to pay the bill. Specifically, after consultation with his counsel, Mr. Cohen and 3 Park came to the following conclusions:
(1) that the user charges, particularly for electricity and labor, were legally objectionable, since the space was vacant and the expenses were not being incurred and Mendes & Mount had instructed the plaintiff (40 Exchange) to turn off the electricity;
(2) that the rent bill was rendered as one combined bill and under the lease there was no requirement that the base rent be paid while the additional rent was being disputed; and, therefore, on the basis of the improper user charges, 3 Park was justified in disputing the entire rent bill; and
(3) that, as a matter of law, it was appropriate for defendant 3 Park to take the position that the plaintiff’s failure and refusal to mitigate damages was a defense to the rent claims. Mr. Cohen’s counsel advised him that there was an emerging trend in the law to the effect that commercial leases as well as residential leases should be treated not as a conveyance of property, as was the case under the old common-law rule, but as contracts subject to the well-established doctrine which states that a party is required to mitigate damages. The plaintiff then commenced a series of actions against Mendes & Mount for the rent.
*478 On its first claim for base rent, the plaintiff was granted summary judgment against Mendes & Mount. With respect to its claim for electrical charges and other escalations, the plaintiff was granted summary judgment as to liability and at an assessment hearing plaintiff was awarded a judgment in the sum of $438,360.70. In March, 1982, after defendants exhausted all appellate remedies, the judgment was collected in the amount of $529,207.40, inclusive of $90,846.70 as interest.
The first base rent action was decided by Justice Stecher on May 23, 1978. He said that Mendes & Mount was induced by the Three Park Avenue Company to breach the defendant’s lease and to move into 3 Park Avenue; that Mendes & Mount’s indemnitor, Three Park Avenue Company, requested the court to deny judgment on the theory that a lease is a contract which must be judged by the standards of any contract including the obligation to mitigate damages, but that the lease here expressly provided that the landlord shall have no such obligation.
His decision was affirmed without opinion by the Appellate Division, First Department, which denied leave to appeal to the Court of Appeals on March 27,1979. On June 5, 1979, the Court of Appeals denied leave to appeal from Justice Stecher’s order (Forty Exch. Co. v Mendes & Mount, 47 NY2d 708). More base rent actions were commenced; the next group (embracing unpaid rents for the period from Jan. 1, 1978 to Jan. 31, 1979) was consolidated for disposition before Justice Riccobono, whose order granting summary judgment was issued on July 18, 1979. He held that since the facts were identical with those in prior actions involving prior periods (although the amounts were different), the defendants were collaterally estopped from relitigating the issues by Justice Stecher’s decision of May 23, 1978, which had been affirmed by the Appellate Division. The next base rent actions (embracing unpaid rents for the period from Feb. 1, 1979 to April 30, 1979) came before Justice Okin, whose order granting plaintiff summary judgment as to base rent was dated December 31, 1979. Justice Okin also based his order on the reasoning set forth in Justice Stecher’s decision as well as on Justice Riccobono’s similar action predicated on the principle of collateral *479 estoppel. It is to be noted that all the rents withheld in these actions were due prior to the Court of Appeals decision on June 5, 1979.
Notices of appeal were filed with respect to the orders of Justices Riccobono and Okin (Oct. 5, 1979 and May 15, 1980, respectively) as well as bonds. The plaintiff moved to dismiss both appeals (April 3, 1981 and Aug. 24, 1981, respectively) and the Appellate Division did so unconditionally (May 7, 1981 and Sept. 7, 1981, respectively). No further appeals were taken.
The final group of base rent actions brought by the plaintiff was consolidated before Justice Leonforte whose order granting plaintiff summary judgment was issued on May 5, 1982. Finding no new issues raised in the action before him and noting that the parties and facts therein (except for the amount of money damages claimed) were identical to those in the motions previously presented to Justices Riccobono and Okin, he also held that the defendant was collaterally estopped from relitigating the same issues.
The appeal from the judgment issued by Justice Leon-forte was dismissed conditionally. The defendants met the condition and the Appellate Division unanimously affirmed without opinion.
All judgments obtained by the plaintiff— $1,388,763.25 — have been paid. 3 Park paid $53,344.50 directly and Mendes & Mount paid the remaining portion, $1,335,418.75, and then deducted the same from its rent to 3 Park, so that 3 Park has paid the entire amount. The only remaining area of dispute between the plaintiff and Mendes & Mount relates to the claimed escalation for the last year of the lease. After the trial was completed, the court was advised that this claim was settled for $400,000 on February 10, 1984.
Although 40 Exchange has been paid the full amount of the base rent due under its lease with Mendes & Mount, plus interest, and has been awarded attorney’s fees in connection with the various actions, it commenced a separate tort action against 3 Park seeking compensatory damages of $10,000,000 and punitive damages, among other things.
*480 C. THE THEORIES OF THIS LAWSUIT
The first contention advanced in this lawsuit is that the defendants induced a breach of contract between the plaintiff, 40 Exchange, and its tenant, Mendes & Mount. Specifically, the claims of 40 Exchange relate to the activities of 3 Park:
(a) in participating in negotiations with Mendes & Mount and their brokers in connection with the proposed relocation of that firm to 3 Park Avenue;
(b) in entering into a lease with Mendes & Mount for space at 3 Park Avenue with knowledge that Mendes & Mount had an existing lease with the plaintiff at 40 Exchange Place;
(c) in entering into a takeover agreement with Mendes & Mount with regard to its lease at 40 Exchange Place; and
(d) in failing to pay base rent pursuant to the takeover agreement after summary judgment on that issue had been determined and entered, and the taking of repetitive spurious appeals from those determinations.
For its part, 3 Park contends that neither 3 Park nor any defendant induced Mendes & Mount to relocate: that Mendes & Mount made its own independent decision and caused its real estate brokers to negotiate with 3 Park’s brokers for acceptable terms for space at 3 Park Avenue. Additionally, 3 Park contends that the takeover agreement proposed by Mendes & Mount and its brokers to 3 Park was a normal and customary element of relocation to new premises. Finally, 3 Park argues that there were sound legal grounds for disputing the claims for base rent and for appealing the repeated grants of summary judgment to 40 Exchange on the issue of base rent.
The second contention of tort liability advanced by the plaintiff as part of its proof at trial involves the so-called tort of bad-faith breach of contract, yet to be recognized in New York. The theoretical underpinning of this tort is that in every contract there is an implied covenant of good faith and fair dealing and that neither party will do anything which may injure the right of the other to receive the benefits of the agreement. A breach of this duty may constitute a tort as well as providing an action on the *481 underlying contract. (Diamond, The Tort of Bad Faith Breach of Contract: When, If At All, Should It Be Extended Beyond Insurance Transactions?, 64 Marquette L Rev 425, 426 [hereinafter cited as Diamond].)
It is claimed that the takeover agreement, although signed by 3 Park and Mendes & Mount, created, in effect, a third-party beneficiary contract running in favor of 40 Exchange. The failure of 3 Park (which defended, managed, and directed the various lawsuits for rent brought by 40 Exchange) to pay the base rent owed to 40 Exchange under the original lease amounted to a bad-faith breach of the takeover agreement for which tort recovery is permissible by 40 Exchange as a third-party beneficiary. For its part, 3 Park denies the validity of this cause of action and additionally contends that its failure to pay the base rent as it became due resulted principally from its assertion of a good-faith defense: namely, that 40 Exchange had a duty to mitigate its damages after Mendes & Mount had moved out.
The plaintiffs argue that because of the actions of the defendants, the value of the building at 40 Exchange Place deteriorated and they were forced to sell at what they claim was a distress price ($6.8 million plus retention of the purported assignment of the claim against Mendes & Mount). They also seek punitive damages.
It is the defendants’ contention that the plaintiffs suffered no damage; that the building was, in fact, sold on April 27, 1979 for more than it was worth to the Webb Land Company, Inc., which was assembling a parcel for a new headquarters for Morgan Guaranty Trust Company.
D. THE TORTS OF INDUCING BREACH OF CONTRACT AND INTERFERENCE WITH CONTRACT RELATIONS
(a) The Legal Requirements
The tort of inducing breach of contract rests upon the broad general principle that to damage another intentionally without justification or privilege is a tort. (Carpenter, Interference with Contract Relations, 41 Harv L Rev 728, 735.) In order to establish a cause of action for inducing a breach of contract, the following essential elements are required: (1) the existence of a valid contract between the *482 plaintiff and the other contracting party; (2) defendant’s knowledge of that contract; (3) the defendant’s intentional and improper procurement of the breach of that contract; and (4) damages. (Guard-Life Corp. v Parker Hardware Mfg. Corp., 50 NY2d 183; Israel v Wood Dolson Co., 1 NY2d 116; Keviczky v Lorber, 290 NY 297; Hornstein v Podwitz, 254 NY 443; Bryce v Wilde, 39 AD2d 291, affd 31 NY2d 882.)
The tort of interference with contractual relations is broader in its scope than the tort of inducing breach of contract. (Carpenter, op. cit., at p 762.) It includes not merely the procurement of a breach of contract but all culpable conduct relating to an invasion of the contract relation. (Ibid.) Therefore, any act that injures or destroys person or property, which retards or prevents performance or which makes performance of the contract of less value to the promisee, may fall within the scope of this tort. (Ibid.)
Here, the plaintiff has specifically pleaded the tort of inducing breach of contract. The testimony offered at trial was sufficient however to also establish a cause of action for tortious interference with contractual relations and I deem the complaint amended to conform the pleadings to the proof in this regard. My analysis of the conduct complained of in this case shall proceed under the requirements of the tort of inducing breach of contract although the two torts are virtually identical. (See Prosser, Law of Torts [4th ed], § 129.)
(b) Evaluation of the Facts against the Legal Requirements for Establishing Tort Liability
The contract between the plaintiff and Mendes & Mount was a lease for space at 40 Exchange Place, which began in 1970 and ran through the spring of 1980. Defendant 3 Park was familiar with the terms of the lease between Mendes & Mount and the plaintiff by virtue of the takeover agreement, which referred to the lease between the plaintiff and Mendes & Mount, annexed it as an exhibit and required that it be initialed by the defendants, all of which was done. What then about the first requirement that the defendant, 3 Park Avenue, intentionally and improperly procured a breach of the lease between 40 Exchange and Mendes & Mount?
*483 My initial finding is that the decision of Mendes & Mount to relocate to 3 Park Avenue was principally the result of its own dissatisfaction with its existing space at 40 Exchange Place. 3 Park apparently offered Mendes & Mount the type of office space that a building of awkward configuration and questionable condition, erected in the last century, could not. I therefore find that the acts of 3 Park in participating in negotiations with Mendes & Mount and their brokers in connection with the proposed relocation of Mendes & Mount to 3 Park Avenue were not tortious.
Nor do I find that the entry by the defendants into a lease with Mendes & Mount for space at 3 Park Avenue with knowledge that the firm had an existing lease with plaintiff at 40 Exchange Place was tortious. Mendes & Mount remained obligated, of course, under its lease with 40 Exchange Place and further, the entry into the new lease resulted predominantly from its desire to obtain more modern office space.
I also hold that the entry by defendant 3 Park into a takeover agreement with Mendes & Mount with regard to its lease at 40 Exchange Place was not tortious. Based upon the credible testimony at trial, I find that the takeover agreement under which 3 Park assumed Mendes & Mount’s rent obligation for the balance of its term at 40 Exchange Place was a familiar element of a transaction under which a commercial tenant at one building with time remaining on its lease moves to new premises.[2]
Tortious conduct, if it exists at all here, rests, it appears, on the failure of Mendes & Mount to pay base rent after the initial grant of summary judgment had been made by Justice Stecher, but before the sale of the building. (See Seidlitz v Auerbach, 230 NY 167.)
Prior to exploring this issue, it is appropriate to point out that although the tortious conduct grounded upon failure to pay base rent is asserted against defendant 3 Park, the obligation to pay base rent remained with the lease-tenant, Mendes & Mount. Under what circumstances then did 3 *484 Park interfere with or induce a breach of Mendes & Mount’s obligation to pay base rent? Although the rent actions were commenced against Mendes & Mount, 3 Park provided counsel for the law firm and, in effect, directed, controlled and managed the defense of those actions. Mendes & Mount was rarely, if ever, consulted regarding the preparation of papers in opposition to the various motions for summary judgment or the subsequent appeals. Based upon its obligations under the takeover agreement as well as its direct and controlling involvement with the base rent actions, which included the failure of Mendes & Mount to pay each monthly base rent obligation as it became due, I conclude that 3 Park induced Mendes & Mount to breach its lease with 40 Exchange. This, in effect, is that same conduct that constituted interference with 40 Exchange’s contractual relations with Mendes & Mount.
Was the inducement to breach the lease justifiable or bona fide? It is the law that in order to establish a cause of action for unlawful interference with the performance of a contract or inducement to breach a contract, it is not necessary to show that the defendant acted with actual malice or ill will; a cause of action is made out if it is demonstrated that the defendant intentionally interfered with the performance of the contract or induced the breach of the contract, without legal or social justification. (32 NY Jur, Interference, § 35.) It is the main contention of 3 Park that Mendes & Mount was legally entitled to press a defense raised in opposition to 40 Exchange’s actions for base rent. Specifically, 3 Park asserts that Mendes & Mount had the absolute right to interpose a defense and litigate it through the Court of Appeals — that the landlord (40 Exchange) was under a duty to mitigate its rent damages. Thus, 3 Park maintains, the bona fide assertion in court of a legal right and defense does not constitute tortious conduct, malicious prosecution or abuse of process. And, therefore, they say, Mendes & Mount had a right to have the highest court of this State rule on that issue and, until that time, the refusal to pay base rent was justifiable.
E. WAS MENDES & MOUNT’S REFUSAL TO PAY BASE RENT JUSTIFIABLE?
Resolution of this issue involves first an acknowledgement that a landlord’s duty to mitigate was not the law of *485 the State of New York, at least with respect to commercial leases, at the time that the doctrine was interposed as an affirmative defense in the various rent actions brought by 40 Exchange. Secondly, resolution involves, of necessity, a glimpse into the operation of stare decisis in a common-law system.
How far may a party resist a clear contractual obligation by insisting that its refusal to comply is based on a doctrine urged upon the courts as the better or modern view, but one not yet the law? In Rappaport v Rappaport (44 Misc 2d 523, affd 24 AD2d 844, mot for lv to app den 16 NY2d 487), the defendant had repeatedly opposed his wife’s eight successive actions under a separation agreement. Eight times the wife asserted her entitlement to certain periodic payments under the agreement. Each time the husband countered with the assertion of certain defenses. Each time the wife made a motion for summary judgment, the husband opposed it and the wife prevailed. Then the wife commenced a new action for malicious use of process or malicious prosecution based on the defendant’s repeated assertion of the defenses in the eight actions even after, in case after case, the wife had been granted summary judgment.
The lower court opinion held (p 525) that “The courts should not deter the assertion of defenses if there is any basis for believing them valid.” In granting defendant’s motion to dismiss the complaint as legally insufficient, the court stated (p 524): “ ‘To support an action for malicious use of process or malicious prosecution it must appear that in consequence of the unfounded civil suits * * * the person or property of the aggrieved individual was interfered with [citations omitted]. In the absence of such interference no cause of action for the foregoing tort is stated’ ”. In Wolf v Wolf (26 AD2d 529) a husband had repeatedly asserted defenses already rejected by the court. In her malicious prosecution action, the wife alleged that her husband’s continued willful and malicious refusal to make payments due under the separation agreement was deliberate and that his repeated interposition of frivolous defenses in her various actions to collect arrears was done to wear her down and capitalize on her husband’s strong financial *486 position and her weak one. The court, at Special Term — while explicitly recognizing that there was substantial support in the record for the wife’s allegation — nonetheless held that she failed to make out an actionable injury as a matter of law. The defense interposed (for the second time) was the occurrence of a condition provided in the separation agreement which would result in reducing the husband’s obligation. Although the supporting evidence offered by the husband in support was frivolous and malicious, the court held that he had the right each time to test a valid condition in the separation agreement on the basis of the facts in evidence.
But, here, the defense of mitigation asserted by Mendes & Mount was not the law of New York with respect to a commercial landlord’s obligation toward a breaching commercial tenant. And, the plaintiff further contends that a clause in the lease in question between 40 Exchange and Mendes & Mount specifically provided that no such duty existed. On the facts then, this case appears to involve a defense that has no legal validity in New York and, additionally, one which was precluded by the terms of the lease and that, as a result, plaintiff’s property right (to use its money) was interfered with. So, argues the plaintiff, the facts here are clearly distinguishable from those appearing in the previously cited cases and call for the imposition of tort liability either under the tort analysis considered here or under the analysis of the tort of bad-faith breach of contract, considered infra.
F. THE DUTY TO MITIGATE
3 Park, admitting that the law of New York was that a landlord had no duty to mitigate its claim for rent damage, states that there was strong support for Mendes & Mount’s counsel’s advice that the plaintiff 40 Exchange’s failure to mitigate its rent claims was a proper defense. That being so, they say that Mendes & Mount had the right to continue to assert that defense until the Court of Appeals had ruled directly on this issue, once and for all.
The law in New York on the subject of landlord’s duty to mitigate rent damages had been established over a hundred years ago when the Court of Appeals, in Becar v Flues (64 NY 518), ruled that a landlord is under no obligation or
*487 duty to his tenant to relet, or attempt to relet, abandoned premises in order to minimize his damages (see, also, 2 Rasch, NY Landlord & Tenant, Summary Proceedings [2d ed], § 875). This seemingly harsh rule is premised upon principles of property law which equate a lease with a transfer of a property interest in the owner’s estate. It follows, so states the rule, that the tenant’s obligation to pay rent arising from the “estate” so purchased is thereupon absolute. (Becar v Flues, supra.) Nevertheless, there has recently been a trend in the law toward requiring a landlord to mitigate damages by reletting the premises. In holding that there was such a mitigation requirement, the court in Paragon Inds. v Williams (122 Misc 2d 628, 629-630 [App Term, 2d Dept]) noted: “As the Court of Appeals * * * long ago noted, the rule that a landlord may sit idly by and collect his rents while making no attempt to relet the premises often imposes harsh results * * * Indeed, both courts and commentators have recognized that the contrary rule is more just (see Parkwood Realty Co. v Marcano [77 Misc 2d 690], 692; Ann., 21 ALR3d 534, 540).” This holding placed New York in step with the view accepted in many other States that a landlord is required to mitigate damages.[3] While Paragon involved a residential lease, the court’s language and analysis is not so limited that it might not be extended to commercial leases as well.
It is safe to say therefore that the old common-law rule has become substantially eroded in New York and that it may not be unreasonable to expect it to be abandoned entirely when it would be again considered by the Court of Appeals. This was the view espoused by Mendes & Mount in their appellate brief submitted on the appeal from the order of Justice Stecher granting summary judgment on the issue of base rent. They further argued that the unconscionability of a lease provision purporting to relieve plaintiff of an obligation to mitigate permitted *488 them to resist enforcement as against public policy. Although the rule of no duty to mitigate has strong precedential authority, I hold that under a common-law system such as ours, a litigant espousing a legal viewpoint not recognized as authoritative has the right to press his views to the highest court of this State (the Court of Appeals) and seek to have that court change the law, and also to seek to have an unconscionable contractual obligation held to be against public policy and therefore unenforceable.
It is not accurate to state that the doctrine of stare decisis mandates from the outset an adherence to the doctrine of no duty to mitigate, for if that were so, then the assertion of the defense of mitigation in the course of the first litigation for rent, heard before Justice Stecher, would, by definition, have been done in bad faith. But, that is not the case. The rule of stare decisis is not so inflexible as to preclude departure in an appropriate case. When a rule “is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing”, it should be discarded. (Bing v Thunig, 2 NY2d 656, 667 [per Fuld, J.].) Stare decisis “was intended, not to effect a ‘petrifying rigidity,’ but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness * * * it loses its right to survive, and no principle constrains us to follow it.” (Supra, p 667; see, also, People v Hobson, 39 NY2d 479.)
Thus, a measure of flexibility is built into a common-law system. As Judge Cardozo said: “I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank disapproval and full abandonment.” (Cardozo, The Nature of the Judicial Process [1921], p 150.) Though overrulings are exceptional events, they do occur when the injustice of an old rule seems less bearable than the dislocation or uncertainty surrounding a change. (Kelman, The Force of Precedent in the Lower Courts, 14 Wayne L Rev 3, 4.)
So, while the doctrine of no duty to mitigate rent damages in connection with real property leases had a long and unscathed history in common-law practice, it appeared that at the time this litigation was begun, this doctrine *489 was not altogether impregnable. (See, e.g., Tenotti v Penati, 48 AD2d 25, relied on by Mendes & Mount in its first appellate argument and by the court in Paragon Inds. v Williams, supra; also 57 E. 54 Realty Corp. v Gay Nineties Realty Corp., 71 Misc 2d 353, 355 [App Term, 1st Dept].)
Nevertheless, the trial-level courts that first heard the issue decided in favor of retaining the no-duty-to-mitigate rule. This, of course, can be expected in a legal system circumscribed by the importance of precedent, because one of the principles of precedent appears to involve the application of the law as last pronounced by superior judicial authority. (See Kelman, op. cit., at p 4.)
The orders resulting from successive appeals from Justice Stecher’s order, which implicitly denied the applicability of the duty-to-mitigate doctrine, resulted in a motion before the Court of Appeals for leave to appeal the decision of the Appellate Division, First Department, which had affirmed, without question, the order of Justice Stecher. The Court of Appeals denied the motion. The effect of this denial is clear. In Matter of Brooklyn Hosp. v Lennon (45 NY2d 820), the court took occasion to restate the rule that denial of a motion for leave to appeal is not equivalent to an affirmance and has no precedential value.
Chief Judge Cardozo noted in Matter of Marchant v Mead-Morrison Mfg. Co. (252 NY 284, 298) that motions for leave to appeal (to the Court of Appeals) though having the careful consideration of all the Judges of the court, lack the authority that attached to a decision with the aid of argument. Appellate Divisions and trial courts may, he noted, give such a refusal some significance of the thinking of the Court of Appeals, but they are not bound thereby as by an authoritative precedent. (Supra.)
Accordingly, it is evident that the Court of Appeals June 5,1979 denial of Mendes & Mount’s motion for leave to appeal did not indicate its view of the substantive merit of the position regarding applicability of the mitigation requirement in the commercial lease context and is therefore of no precedential value on that issue. After June 5, 1979 (the time when the Court of Appeals denied leave to appeal), there remained the possibility not only that the court might eventually accept jurisdiction of a case pre *490 senting this issue, but that it might decide the issue favorably to Mendes & Mount’s position. Certainly, it would not be unreasonable to expect the court to address this important question at some time and it is not illogical to conclude that the court might more likely take jurisdiction of one of the later Mendes & Mount cases when the failure to have mitigated appeared more egregious and wasteful, or when the Court of Appeals might be more sympathetic to such a defense and, at the same time, to decide if the clause in the lease (art 18, “Remedies of Landlord”) was unconscionable and therefore unenforceable as against public policy (see Sternaman v Metropolitan Life Ins. Co., 170 NY 13; Campbell Soup Co. v Wentz, 172 F2d 80).
Mendes & Mount attempted to have the Court of Appeals rule on the no-duty-to-mitigate doctrine in the context of an appeal of Justice Stecher’s original order. The Court of Appeals on June 5, 1979 denied leave to appeal from the Appellate Division’s order affirming Justice Stecher’s order. Nevertheless with respect to the orders of Justices Riccobono and Okin, notices of appeal were filed (on Oct. 5, 1979 and May 15, 1980, respectively), as were bonds. Thereafter, the plaintiff moved to dismiss them on April 3, 1981 and August 24, 1981, respectively, and the Appellate Division did so unconditionally on May 7, 1981 and September 17, 1981, respectively. The appeal from Justice Leonforte’s order and judgment was dismissed conditionally. The defendant met the condition and the Appellate Division unanimously affirmed without opinion. So, with respect to the two subsequent base rent actions (following Justice Stecher’s decision), principally defended on the basis that a landlord has an affirmative duty to mitigate rent damages, Mendes & Mount did not thereafter press its defense to the highest court of this State for an authoritative determination.
The fact that the Court of Appeals denied leave to appeal from the Appellate Division’s affirmance of Justice Stecher’s order did not, I hold, conclusively resolve the matter. As previously noted, it is not unreasonable to expect that if the Court of Appeals were inclined to change the doctrine regarding the landlord’s duty to mitigate, it *491 might do so in one of the later Mendes & Mount base rent cases when the failure of the landlord to mitigate appeared more wasteful.
Mendes & Mount had a right to continue their test of the law and to obtain a ruling on their position from the highest court of this State. Under the circumstances, did the abandonment of further appeals following the granting of the motion to dismiss by the Appellate Division affect their posture? I think not. In the spring and summer of 1981, when the defendant’s appeals were dismissed, the then-current average prime rate was even higher (19%; 20.5%) than the average prime rate during the period encompassed by the two judgments involved which were the basis for plaintiff’s damage claim for loss of interest. If, as plaintiff argued, delay was the defendants’ goal in order to give them the opportunity to earn more on the withheld rents than the interest rates allowed by the court, then the defendants’ decision not to appeal further is completely at odds with this allegation. The more likely inference is that the decision was reached after their counsel assessed the likelihood of success on further appeals as against all the associated costs.
Since the base rent claim that formed the basis of the judgment issued by Justice Leonforte was for a period of time after the building was sold by the plaintiff (April 27, 1979), I hold that Mendes & Mount’s resistance by disputing their liability for rent for the period of time after the building was sold did not constitute tortious conduct.
G. THE TORT OF BAD-FAITH BREACH OF CONTRACT
The tort of bad-faith breach of contract, as I shall refer to it, may arise because of the implied covenant of good faith that exists in every contract. (Diamond, op. cit., at pp 426, 430.) In recent years, courts in several jurisdictions have considered this implied covenant by noting that a breach of it may be tortious, thereby permitting the injured promisee remedial relief that would be unavailable in an action based upon a contract. (Ibid.; Wagner v Benson, 101 Cal App 3d 27 [dictum].)
The rationale for this tort is that an injured party seeking judicial redress for a breach of contract has an insignificant “remedial arsonal at his disposal” when he is *492 limited to the recovery of compensatory damages, and only for those economic injuries which were foreseeable at the time the contract was made. (Diamond, op. cit., at p 433.) “The more extensive proximate cause test employed for tort liability * * * is inapplicable [and] [n] either damages for emotional distress nor punitive damages may be recovered.” {Id., at p 434.) Thus, our system of justice provides an ample incentive for a party to breach a contract. “[A] promisor often finds breach attractive not because anticipated gains from the breach exceed anticipated losses, but because he expects never to pay for that liability.” {Id., at p 440; see, generally, Cohen, The Basis of Contract, 46 Harv L Rev 553, 571-572; Goetz & Scott, Enforcing Promises: An Examination of the Basis of Contract, 89 Yale LJ 1261.) “The system has been corrupted. The tail is wagging the dog, and in a most perverted way. A remedial system which was intended to deter intentional breaches * * * has, by its very irrelevance, become the determinative element in inducing intentional breaches which serve no societal function and which are, therefore, in violation of moral and economic concepts of justice.” (Diamond, op. cit., at p 442.)
Under the present remedial system established within contract law, justice often is a fiction {id., at p 443) for which the nascent tort of bad-faith breach of contract could provide a solution while leaving contract remedies intact. {Ibid.)
To the extent that acceptance of this tort doctrine might conflict[4] with past appellate holdings in, for example, Rappaport v Rappaport (supra) and Wolf v Wolf (supra), this doctrine was never raised or argued before these appellate tribunals that it rests on sound notions of public policy and provides a more just and rational solution for the aggrieved party than has previously been available. Indeed, this doctrine has been well settled in our State in cases where an insurer acts in bad faith in refusing to settle a case within the policy limits of the liability insurance contract (Gordon v Nationwide Mut. Ins. Co., 30 NY2d 427, 436-437, cert den 410 US 931).
*493 My analysis of the conduct complained of here in the context of the tort of bad-faith breach of contract is as follows: Although 40 Exchange was not a direct party to the takeover agreement between 3 Park and Mendes & Mount, it was a third-party beneficiary of that agreement. And, according to the well-established rule (22 NY Jur 2d, Contracts, §§ 271, 272), a person for whose benefit a contract is made, although not a party to the agreement and not furnishing the consideration for it, may maintain a lawsuit on the contract. The rights of the third-party beneficiary derive from the promise of the other parties as having been made for his benefit, even though no express promise has been made to the third party. Therefore, under a third-party beneficiary theory, 40 Exchange, the plaintiff here, would be entitled to enforce the terms of the takeover agreement. But, even under this new tort, there may be occasions when, although all its essential elements are present, liability is not appropriate due to special circumstances. (Diamond, op. cit., at p 452.) For example, a breach might be privileged if, for example, it was induced not by financial motives but by overriding social or personal concerns such as a breach of the term of a lease because the leased premises are no longer suitable. Such a finding might cause a court to limit the tort’s coverage to breaches motivated solely or primarily by economic considerations. (Ibid.) And, as I have previously determined the repeated litigation involving base rent claims based upon the duty-to-mitigate doctrine was privileged.
In summary, on either theory,[5]1 hold that 3 Park had the right as part of its defense of the rent actions to resist payment of base rent based upon the defenses asserted that plaintiff, 40 Exchange, was under a duty to mitigate its damages and that the covenant (art 18 of the lease) was unenforceable because it was unconscionable and against public policy.
Accordingly, a judgment shall be entered in favor of the defendants. No costs.

. This case, originally instituted in the Supreme Court, New York County, was transferred pursuant to CPLR 325 (subd [d]) to the Civil Court of the City of New York, County of New York, for trial.

. This was testified to by Norman Levy, who aside from being one of the owners of 40 Exchange was, and is, chairman of the board of Cross & Brown, a large and important real estate firm based in New York City.

. Condor Corp. v Arlen Realty & Dev. Corp., 529 F2d 87; Dushoff v Phoenix Co., 23 Ariz App 238; State v Boyle, 168 Ind App 643; Vawter v McKissick, 159 NW2d 538 [Iowa]; Friedman v Colonial Oil Co., 236 Iowa 140; Gordon v Consolidated Sun Ray, 195 Kan 341; Marmont v Axe, 135 Kan 368; Wilson v Ruhl, 277 Md 607; Novak v Fontaine Furniture Co., 84 NH 93; Weinstein v Griffin, 241 NC 161; Stern v Taft, 49 Ohio App 2d 405; Kulm v Coast-to-Coast Stores, 248 Ore 436; Wright v Baumann, 239 Ore 410; United States Rubber Co. v White Tire Co., 231 SC 84; Meyer v Evans, 16 Utah 2d 56; Martin v Siegley, 123 Wash 683.

. Tort matters are a category of case where “courts will, if necessary, more readily reexamine established precedent to achieve the ends of justice in a more modern context (see, e.g., Victorson v Bock Laundry Mach. Co., 37 NY2d 395; Goldberg v Kollsman Instrument Corp., 12 NY2d 432; Bing v Thunig, 2 NY2d 656; Woods v Lancet, 303 NY 349).” [People v Hobson, 39 NY2d 479, 489 [per Breitel, Ch. J.].)

. Since the proof at trial established a cause of action under this theory of tort, I deem the complaint amended.