**TELERATE SYSTEMS, INC., Plaintiff,**

v.

**Marshall CARO and Programit, Inc., Defendants.**

No. 85 Civ. 9132 (DNE).

United States District Court, S.D. New York.

June 10, 1988.

Leventhal & Senter, Washington, D.C. (Meredith S. Senter, of counsel), Hartman & Craven, New York City (Gary Stahl, of counsel), Ropes & Gray, Washington, D.C., for plaintiff.

Milberg, Weiss, Bershad, Specthrie & Lerach, New York City (Jared Specthrie and Sanford P. Dumain, of counsel), Fryer, Ross & Gowen, New York City (Hugh N. Fryer, of counsel), for defendants.

## OPINION AND ORDER

EDELSTEIN, District Judge:

Plaintiff, Telerate Systems, Inc. ("Telerate"), a provider of financial information, has moved preliminarily to enjoin the defendants, Programit, Inc. ("Programit"), and its chairman and chief executive officer, Marshall Caro ("Caro"), from selling, manufacturing, and distributing a software package called "Excel–A–Rate." Plaintiff claims that defendants have 1) violated the copyright laws; 2) misappropriated plaintiff's trade secrets; 3) interfered with contracts between Telerate and some of their customers; and 4) violated the Telecommunications Act.[1] Defendants have cross-moved preliminary to enjoin plaintiff from disconnecting Excel–A–Rate users from the Telerate network. Defendants contend that plaintiff has violated the federal antitrust laws. Plaintiff's motion is granted. Defendants' motion is denied.[2]

## BACKGROUND

Telerate is a provider of computerized financial information. Specifically, plaintiff provides "real time" prices, rates, and other information for various financial instruments and commodities, as well as a news wire. Programit is a computer software development company that has manufactured and sold a program it calls "Excel–A–Rate." The "Excel–A–Rate" program permits a subscriber to use a personal computer ("PC") to receive and to analyze the financial information provided by Telerate.

Plaintiff offers access to its database by several different methods. The most commonly used access method is through the Standard Telerate Network ("STN"). STN uses a number of telephone "party lines,"

---

1. The complaint also contains a Lanham Act claim and state law theft of services and unfair competition claims. Although these claims were not addressed at the hearing on the motion for a preliminary injunction, plaintiff has reserved the right to pursue these claims at trial.

2. Plaintiff moved to supplement the record with additional affidavits. Defendants oppose this motion. The court has considered this additional material, however, the additional material did not affect the outcome of the motion.

each of which serves up to 16 subscribers. Each of the 16 parties on the line uses a terminal, called the Standard Telerate Terminal, which is leased to them by Telerate. Terminals on the STN may both receive and transmit data. The STN is the focus of this lawsuit.

Plaintiff also offers access to its database through the STN "party lines" using a subscriber's own equipment, typically a personal computer ("PC"). *See* Cowles Reply Affid. ¶¶ 16, 17.[3] To use this "hybrid" service, a subscriber must obtain permission from Telerate, which then supplies the subscriber with a floppy disk to program the PC. This service is more expensive than the STN service using the Telerate terminal.

The information in the Telerate database may also be received using Standard Output Protocol ("SOP") service. Under SOP service, a Telerate regional computer is connected directly by a point-to-point communication line to the customer's computer. Telerate does not provide a terminal to SOP customers. SOP subscribers not only can receive data, but also may store the data, process it and display it on multiple screens that are connected to their computer. This service is significantly more expensive than STN and is economical only if a number of terminals are used.

Telerate also offers Telerate Access Service ("TAS"). TAS subscribers use their own terminals and access the database through Tymnet, a private network. As under the "hybrid" STN service, Telerate provides a TAS subscriber with a floppy disk containing a program that allows access to the system.

Telerate also offers two related services: Broadcast Service, whereby subscribers receive information via satellite and Sideband Service by which subscribers receive information through an FM radio link. Under these two access modes, the customer uses his own equipment, usually a PC, and a floppy disk provided by Telerate. These two services do not allow access to the entire database. Telerate also provides access to its database through other financial information networks by means of such other networks' equipment, and has also provided a number of multi-drop "party lines" to a company in Canada that relicenses access to the ultimate consumer.

Plaintiff advised defendants that it considered the use of the Excel–A–Rate to be a violation of the Standard Telerate Agreement, which is the contract between Telerate and STN subscribers. Plaintiff has also advised subscribers that have informed Telerate of plans to install Excel–A–Rate that this would constitute a violation of the standard agreement.

The standard Telerate agreement provides that the subscriber shall not move Telerate equipment and that no foreign equipment shall be interfaced with Telerate equipment. For a fee, Telerate will waive this provision and permit subscribers to attach equipment to the Telerate terminal including a printer or a PC using the Excel–A–Rate program.

*Excel–A–Rate*

The Excel–A–Rate program permits an STN subscriber to receive Telerate data through a PC rather than a Telerate Terminal. Excel–A–Rate enables the PC to emulate the Telerate Terminal because it contains the Standard Telerate Protocol ("STP"). A protocol is a series of procedures and conventions that govern communications between a computer and various terminals linked to that computer. *See* Affidavit of Anthony Sabatini, Jr. ¶ 2 ("Sabatini Affid.").[4] Put another way, the protocol tells the computer "how" as opposed to "what" to communicate. *See* Sabatini Affid. ¶ 2.

A PC equipped with Excel–A–Rate does more than the basic Telerate terminal. In addition to simply sending, receiving, and displaying data, Excel–A–Rate permits the user continuously to update data requests and also to obtain a hard copy of the data. Excel–A–Rate also allows the subscriber to copy the data onto a disk and analyze the

---

**3.** Richard J. Cowles is Executive Vice President of Telerate.

**4.** Anthony Sabatini, Jr. is Vice President for Systems Development of Telerate.

data. Further, Excel–A–Rate enables the user to attach additional terminals to the system.

Defendants have marketed Excel–A–Rate as a "way to get the most from Telerate." *See* Plaintiff's Ex. 4. A fact sheet distributed by defendants describes the Excel-A-Rate as a software package that replaces the Telerate terminal and enables a subscriber to connect a PC directly to the Telerate data line. Defendants promotional literature has also focused on the updating and copying features of the program.

*Relationship Between Caro and Telerate*

From late 1980 until early 1983, defendant Caro worked for Telerate as a consultant. Caro's first project was to develop a terminal that would permit a user to obtain multiple page updates of data and to display them on multiple screens. As part of this project, Caro worked on a written description of the Standard Telerate Protocol. In order to create this document, Caro was given access to the STP. In May of 1981, Caro completed the description of the STP. The completed document contained the following legend:

> Copyright 1981 by Telerate Systems Incorporated. All rights reserved. The information contained herein is proprietary and may not be reproduced in whole or in part without the explicit written permission of Telerate Systems Incorporated.

Caro was also involved in a number of other projects for Telerate including: writing a description and implementation guide for the SOP; development of a PC terminal that would use the STP; work on a "driver" for a PC that would use a standard industry protocol; and work on documenting a broadcast protocol. Sabatini Reply Affid. ¶ 62. The PC terminal project and the broadcast protocol project both involved access to the STP.

## I. PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

In this circuit, the standard for the issuance of a preliminary injunction is a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the mer-

its or (2) sufficiently serious question going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary injunctive relief." *Kaplan v. Board of Educ.*, 759 F.2d 256, 259 (2d Cir.1985); *accord Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1141 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987).

## LIKELIHOOD OF SUCCESS ON THE MERITS

### A. TORTIOUS INTERFERENCE WITH CONTRACT

To establish tortious interference with contract under New York law, plaintiff must prove that:

1) there is a valid contract between the plaintiff and a third party; and

2) the defendant knew of the contract; and

3) the defendant intentionally and improperly procured the breach of that contract; and

4) damages resulted therefrom.

*Forty Exchange Co. v. Cohen*, 125 Misc.2d 475, 481–82, 479 N.Y.S.2d 628, 633 (Civ.Ct. 1984); *see Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 75 (2d Cir. 1986).

There is no dispute that there is a valid contract between the plaintiff and its subscribers. Further, it is clear that defendants had knowledge of the contract as a result of the work performed for Telerate and based on letters from Telerate advising defendants of the contracts. It is also clear that defendants induced subscribers to use the Excel–A–Rate program instead of the Telerate terminal. The defendants' advertising and "fact sheets" pointedly seek to have subscribers disconnect their Telerate terminals and use a PC to perform functions that the terminal cannot. Finally, the use of Excel–A–Rate will cause delays in response time for requested information. This delay damages the performance of the system and diminishes plaintiff's reputation. If the delays are frequent many subscribers are likely to switch

to another information provider. This satisfies the fourth element of the test.

■ The only dispute regarding this claim centers on the meaning of the Telerate contract. Depending on the interpretation, the use of Excel–A–Rate may or may not constitute a breach of the agreement. If it is a breach, defendants may be found to have induced that breach and the third element of the claim will be satisfied.

The standard contract provides in part that:

1. Subscriber shall pay Telerate ... monthly fees ... for the Services ... which include the equipment and information comprising the Services.... The terms of this Agreement shall commence on the date following installation of the equipment ...

6. The equipment may not be moved, modified, or interfaced with any other equipment without Telerate's prior written consent. Subscriber shall be responsible for all physical loss or damage to the equipment used to deliver Services to its premises unless such loss or damage is due entirely to the fault or negligence of Telerate....

Telerate contends that the contract is violated in two ways. First, in order to install the PC, the Telerate terminal must be disconnected and moved. Second, if the telephone lines that are used to transmit the date to the users location are deemed to be "Telerate Equipment," attaching the PC to the telephone lines will constitute an unauthorized interface.

Excel–A–Rate is designed to be connected directly to the telephone data line.[5] Testimony of Marshall Caro, Tr. at 177. Thus, the installation of Excel–A–Rate would require the user to move the Telerate Terminal, which would violate the contract.

■ With respect to plaintiff's second claim under the contract, it is disputed whether the data lines constitute "Telerate Equipment." Defendants contend that the "equipment" referred to in the contract means only the Telerate terminal.

The court finds that the contract is not ambiguous regarding the meaning of "equipment." While the two parties disagree as to the meaning of the term, this does not necessarily establish that the contract is ambiguous. *Libra Bank Ltd. v. Banco Nacional De Costa Rica,* 570 F.Supp. 870, 893 (S.D.N.Y.1983). The court finds that the term "equipment" includes all equipment used to deliver the service to the customer including the main computer, the terminal lines and the terminal.[6] This definition is consistent with paragraph six of the contract which uses the term "equipment" with the phrase "used to deliver Services to its premises." The equipment therefore constitutes more than simply the on-site Telerate terminal and includes all of the equipment needed to deliver the service.

Given this definition of "equipment" the use of Excel–A–Rate constitutes a breach of the agreement in that foreign equipment, specifically the PC, is interfaced with the Telerate data line. Plaintiff has established a likelihood of success on the merits of the interference with contractual relationship claim.

## B.  COPYRIGHT CLAIM

Plaintiff claims that defendants have violated the federal copyright laws by selling Excel–A–Rate and inducing purchasers to violate plaintiff's copyright by copying the Telerate database with Excel–A–Rate. Defendants assert that plaintiff does not hold a valid copyright. In the alternative, defendants claim that even if there is a valid copyright, there is no infringement of

---

**5.** The Excel–A–Rate PC may also be attached to one of the ports of the Telerate Terminal. This hook up does not permit the Excel–A–Rate to perform some of the additional features noted previously. It is clear that this method of attaching the Excel–A–Rate would be in violation of any interpretation of the Standard Agreement.

**6.** As discussed *infra* at 234, the product Telerate subscribers purchase is access to the Telerate database. The system and all the equipment necessary to provide that access is better viewed as one entity.

plaintiff's display right because Excel–A–Rate users have not publicly displayed the database. Defendants also argue that the copying of the database by Excel–A–Rate users constitutes a fair use. Finally, defendants oppose this claim by asserting that they cannot be found vicariously liable for any violation of the copyright laws by Excel–A–Rate users.

### 1. *Prima Facie Copyright Infringement Claim*

A plaintiff in a copyright case must prove two elements: (1) ownership of the copyright; and (2) infringement by the defendant. *See* Nimmer on Copyright § 13.01. A copyright registration certificate "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Thus, the existence of a registration certificate shifts to the defendant the burden of disproving plaintiff's ownership of the copyright. Plaintiff has produced a certificate of registration and contends that it has thereby established a prima facie case of copyright ownership. *See* Complaint Ex. 1.

■ Defendants, however, allege that plaintiff has failed to establish a prima facie case because the true date of first publication was more than five years before the registration certificate. First, defendants indicate that Telerate has been in business since 1970 and the registration certificate recites October 18, 1985 as the date of first publication. Defendants reason that the database must have been first published more than five years prior to the date of registration, which was October 25, 1985. Second, defendants contend that because the database is constantly updated it "is patently inconsistent . . . that the copyright for the database at that given time was registered on October 25, 1985." Defendants' Memorandum in Opposition at 42

("Defendants' Memo"). Accordingly, the defendants conclude that plaintiff has not established a prima facie case of copyright ownership.

First, defendants' position is merely conjecture. Defendants have adduced no evidence that would suggest a different date of first publication for the database than the date stated on the registration certificate. Consequently, because the registration certificate is prima facie evidence of the facts stated in it, *see* 17 U.S.C. § 410(c), the certificate is prima facie evidence that the date of first publication is October 18, 1985. Defendants have failed to disprove that fact, thus the court finds that plaintiff has established a prima facie case of copyright ownership.

Moreover, it is within the court's discretion to determine the evidentiary weight to be afforded a registration certificate dated more than five years after the first date of publication. *See* 17 U.S.C. § 410(c). Under the Copyright Act of 1909, which was in effect until 1978, a registration certificate was prima facie evidence of a copyright, regardless of the date of first publication. *See* Nimmer on Copyright § 12.11[A]. The 1976 Act added the five year requirement because "the longer the lapse of time between publication and registration the less likely to be reliable are the facts stated in the certificate." H.Rep. No. 1476, 94th Cong., 2d Sess., 156, *reprinted in* 1976 Code Cong. and Admin.News 5659, 5772–73. The court, however, finds no reason to consider the plaintiff's registration certificate unreliable. Accordingly, the court would, in any event, accept the date of first publication on the registration certificate for purposes of establishing a prima facie case under 17 U.S.C. § 410(c).[7]

The defendants also assert substantive defenses to the claim of copyright infringement. Defendants contend that they are not liable for infringement under a theory of vicarious liability or contributory in-

---

7. Even if the certificate were in fact found to have been issued more than five years after the actual date of first publication, the court would

be inclined to give the certificate the weight of prima facie evidence, as permitted under Section 410(c).

fringement[8] as alleged by the plaintiff. Second, defendants assert the defense of fair use. Finally, defendants claim that they are authorized to display publicly Telerate's database.[9]

## 2. *Vicarious Liability*

It is undisputed that the defendants in this case have not themselves copied the Telerate database. Plaintiff, therefore, bases its claim on a theory of vicarious liability. Telerate alleges that, by providing the means by which its customers may copy Telerate's database, defendants are vicariously liable for the alleged infringement by its customers. Defendants contend that vicarious liability is unavailable in copyright actions.

In *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), the Supreme Court addressed the issue of vicarious liability in the context of a copyright case. In *Sony*, two producers who held copyrights on a substantial number of motion pictures and television programs sought damages and an injunction against the Sony Corporation of America ("Sony"), a manufacturer of home video recorders. The case turned on whether Sony could be held liable for the clearly unauthorized copying of plaintiffs' copyrighted works by the purchasers of Sony video recorders. In the absence of specific statutory guidance, the Supreme Court analogized to the field of patent law and concluded that:

> [T]he sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of *substantial noninfringing uses.*

*Sony, supra,* 434 U.S. at 442, 104 S.Ct. at 789 (emphasis added).

Defendants contend that the *Sony* Court "explicitly rejected" the theory of contributory infringement. This is simply not true. The Court clearly stated that contributory infringement is available in cases in which it is necessary to protect a copyright holder's statutory monopoly by extending it to protect against copying devices. *See Sony, supra* 434 U.S. at 442, 104 S.Ct. at 788. The Court was careful to note that the main issue is to balance the interests of the copyright holder against the rights of others freely to engage in unrelated areas of commerce. *See id.* Accordingly, the Court settled on the fairly strict standard that to sustain a claim of contributory infringement a plaintiff must demonstrate that a defendant's product has no "substantial noninfringing uses." *Id.*

The defendants contend that Excel–A–Rate has "at least one significant use ... which cannot conceivably be termed 'infringing,'" namely that it "enables Telerate's customers to use a personal computer to analyze the data received by Telerate." Defendants' Memo at 32. The data, however, must be copied by the program in order to analyze it. Contrary to defendants' contention, therefore, the suggested noninfringing use is in fact the primary infringing activity—copying. Quite clearly, absent a valid defense, copying is an infringement of copyright. Accordingly, the court proceeds to evaluate the defense of fair use asserted by the defendant.

## 3. *Fair Use Defense*

The Copyright Act provides that "the fair use of a copyrighted work ... is not an infringement of copyright." 17 U.S.C. § 107. Section 107 also provides four factors that a court must consider in determining whether a particular use is fair:

> 1. the purpose and character of the use, including whether such use is of a

---

**8.** The theory of vicarious liability in the context of intellectual property is alternatively called "contributory infringement."

**9.** The defendants also assert the defense of unclean hands defense by alleging that the plaintiff has violated the federal antitrust laws. Be-

cause the court finds that defendant did not demonstrate a likelihood of success on the merits of those claims, the unclean hands defense is unavailing and, accordingly, not considered in the instant discussion.

commercial nature or is for nonprofit educational purposes;

    2.  the nature of the copyrighted work;

    3.  the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

    4.  the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107(1)–(4).

    a.  Purpose and Character of Use

    ■  Telerate customers copy the information provided by Telerate primarily to analyze it and to apply the analysis in the financial markets. The purpose of the infringers' use of Telerate's work is thus for private commercial gain. Although a commercial use does not by itself defeat a defense of fair use, "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony, supra,* 464 U.S. at 451, 104 S.Ct. at 793. Further, "the crux of the profit/non-profit distinction is ... whether the user stands to profit from exploitation of the copyrighted material *without paying the customary price.*" *Harper & Row, Publishers, Inc. v. Nation Enterps.,* 471 U.S. 539, 562, 105 S.Ct. 2218, 2231–32, 85 L.Ed.2d 588 (1985) (emphasis added). It appears that plaintiff normally charges customers for the privilege of copying portions of its database and accordingly, it is likely that plaintiffs would prevail on the first factor of the fair use defense.

    b.  Nature of the Copyrighted Work

    The defendants claim that the Telerate database is a compilation and therefore is "more susceptible to a finding of fair use." Defendants' Memo at 35. Although the court, in deciding the question of fair use, may consider whether a work is original, imaginative, or creative, it may also consider whether the work represents "a substantial investment of time and labor made in anticipation of financial return." *MCA, Inc. v. Wilson,* 677 F.2d 180, 182 (2d Cir. 1981). The work in question appears to have some elements of both—that is, it may not be imaginative or creative in a literary sense, but it does represent a significant investment of time and effort for the sole purpose of financial return. Accordingly, the nature of plaintiff's work dictates a result neither in favor nor against a finding of fair use.

    c.  Amount and Substantiality of Portion Used

    The defendants assert in conclusory fashion that "[o]nly a small portion of Telerate's database can be copied at any time" and that "[t]ypically, only several pages out of the database of over 20,000 pages are of interest to the viewer." Defendants' Memo at 35. The defendants thus conclude that the portion of the database used by the alleged infringers is minor and points toward a finding of fair use.

    In considering the third factor of the fair use defense, a court must consider not only the quantitative but also the qualitative substantiality of the copying. *See* Nimmer, Nimmer on Copyright ¶ 13.05[A][3] at 13–79. The database in question is, as defendants admit, designed to be used and read one page at a time. Its essence is the price quotations of various securities and newsletter-type of information. It is misleading therefore to suggest that copying only a few pages of 20,000 total pages of information on the database is not substantial. Although as a purely quantitative matter such use is not substantial, qualitatively, copying those few pages may be substantial in light of the structure and typical use of the database. Thus, it seems likely that plaintiffs would prevail on the issue of substantial use.

    d.  Effect on the Market

    This element "requires proof either that a particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work." *Sony,* 464 U.S. at 451, 104 S.Ct. at 793. Plaintiff need not show actual present harm, nor need it show with certainty that future harm will result. *Consumer Union of the United States,*

*Inc. v. General Signal Corp.*, 724 F.2d 1044, 1050 (2d Cir.1983), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). Defendants contend that the copying feature of Excel–A–Rate does not adversely affect the potential market for Telerate's database. To the contrary, defendants suggest that the claimed improvement in service Excel–A–Rate produces may actually increase the market for Telerate. This argument is unavailing for two reasons.

First, Telerate also provides an optional copying feature with its service, for which it charges a separate fee. The standard Telerate service does not include copying. Thus, defendants' product allows customers to use Telerate's database in a manner that exceeds the purpose contemplated by the agreement between the standard service user and Telerate. Consequently, it is fair to conclude that Telerate loses the opportunity to charge for the privilege of copying its database.

Second, the use of Excel–A–Rate is likely to impair service to other Telerate subscribers on the same party line. *See supra* at 225. Therefore, the unauthorized copying of the database by the defendants' product may result in a deterioration of service to Telerate customers, which may in turn erode Telerate's market by damaging its reputation for reliability. Accordingly, it is likely that plaintiff will prevail on the factor of effect on the market.

e. Fair Use Summary

In summary, it appears that factors one, three, and four enumerated in Section 107 weigh against a fair use defense. Although the factors of Section 107 are merely illustrative and not exhaustive, *see* Nimmer, Nimmer on Copyright ¶ 13.05[A] at 13–66 to 13–67, at this stage of the case, those factors suggest that, at a minimum, plaintiffs have demonstrated a likelihood of success on the merits of its copyright infringement claim.

**10.** Congress amended the Telecommunications Act in 1984 and redesignated Section 605 as

C. TELECOMMUNICATIONS ACT

Plaintiff asserts that defendants' sale of the Excel–A–Rate program is a violation of Section 705 of the Communications Act. 47 U.S.C. § 605.[10] Section 705(a) is composed of four sentences containing various prohibitions. Plaintiff contends that defendants have violated the first and fourth sentences. The first sentence provides that:

Except as authorized by Chapter 119, Title 19, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney....

In order to establish liability under the first sentence of Section 705, the defendant must have (1) intercepted or aided in the interception of, and (2) divulged or published or aided the divulging or publishing of, a communication transmitted by the plaintiff. *See California Satellite Systems v. Seimon,* 767 F.2d 1364, 1366 (9th Cir.1985); Note, *The Piracy of Subscription Television: An Alternative to the Communications Law,* 56 S.Cal.L.Rev. 935940–41 (1983) [hereinafter *Piracy of Television*]. Further, the signal must not have been intended for the general public. *See* 47 U.S.C. 605(a).

In this case, it is uncontested that Excel–A–Rate users have intercepted a communication transmitted by the plaintiff that was not intended for the general public. There are, however, two issues relating to the claim under the first sentence: (1) whether there has been an *unauthorized* interception of the communication; and (2) whether there has been any publication or divulging of the communication. *See Eastern Microwave, Inc. v. Doubleday Sports, Inc.,* 691 F.2d 125, 127 (2nd Cir.1982).

■ It is uncontested that Excel–A–Rate users have intercepted a communication transmitted by the plaintiff that was not

Section 705. Nevertheless, Section 705 is still codified at 47 U.S.C. § 605.

intended for the general public. Although not conceded, it is equally apparent that the Excel–A–Rate permits a Telerate subscriber to receive unauthorized communications. The Standard Telerate Agreement provides that the subscriber shall not interface any foreign equipment with or move Telerate equipment. As discussed with respect to the tortious interference with contract claim, the use of the Excel–A–Rate constitutes a breach of the Standard Telerate Agreement. *See supra* at 231. Therefore, the receipt of information using the Excel–A–Rate is unauthorized.

■ The Excel–A–Rate user does not necessarily divulge or publish the transmission received to any third party. Nevertheless, courts applying Section 705 have employed a legal fiction to bring sellers and manufacturers of interception devices within the scope of this section of the statute. *Piracy of Television, supra*, 56 S.Cal.L.Rev. at 946–47; *see* Brown & Helland, *Section 605 of the Communications Act: Teaching A Salty Old Dog New Tricks*, 34 Cath.U.L.Rev. 635, 664 (1984). Courts have held that the act of viewing a transmission that the viewer was not authorized to receive constitutes a publication. *See, e.g., California Satellite Systems v. Seimon*, 767 F.2d 1364, 1366 (9th Cir.1985); *National Subscription Television v. S & H TV*, 644 F.2d 820, 826 (9th Cir.1981); *Ciminelli v. Cablevision*, 583 F.Supp. 158, 164 (E.D.N.Y.1984) (appendix reprinting ruling from the bench in *Cablevision v. Annasonic Electronic Supply*, No. CV–83–5159 (E.D.N.Y. Feb. 10, 1984)); *Cox Cable Cleveland Area, Inc. v. King*, 582 F.Supp. 376, 380 (N.D.Ohio 1983). While this legal fiction has been criticized by commentators, *see e.g.* Brown & Helland, *supra*, 54 S.Cal.L.Rev. at 946–47, it is consistent with the broad scope that Congress has indicated should be given to the statute, 130 Cong.Rec. S14286 (daily ed. Oct. 11, 1984) (statement of Sen. Packwood), *reprinted in* 1978 U.S.Code Cong. & Ad.News 4746; *see also* Electronic Com-

munications Privacy Act of 1986, H.R.Rep. No. 647, 99th Cong., 2d Sess. 22 (1986) (Communications Act might have some limited application to interception of data transmissions and electronic mail by private parties). Further, by interpreting the statute in this manner, it includes within the scope of this section activities that should be prohibited and might otherwise not be covered by any statute. *See Ciminelli*, 583 F.Supp. at 164. Under these circumstances, the court will continue to employ this legal fiction.

The viewing of the data by the Telerate subscriber using Excel–A–Rate, therefore, constitutes a publication within the meaning of the statute. Further, the use of the Excel–A–Rate product in conjunction with a personal computer to receive Telerate data is not an "authorized channel" of transmission and thus a violation of Section 705. Thus, plaintiff has established a likelihood of success on the merits of the claim relating to the first sentence on Section 705 and accordingly, the court need not address the plaintiff's alternative claim under § 705.

### D. MISAPPROPRIATION OF A TRADE SECRET

With regard to trade secrets, New York has adopted the approach of the Restatement of Torts (1939).[11] *Q–Co Industries, Inc., v. Hoffman*, 625 F.Supp. 608, 616 (S.D.N.Y.1985). *See Delta Filter Corp. v. Morin*, 108 A.D.2d 991, 992, 485 N.Y.S.2d 143, 144 (3rd Dep't 1985). The Restatement states that "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.... A trade secret is a process or device for continuous use in the operation of the business." Restatement of Torts § 757 comment b.

---

**11.** The Restatement (Second) of Torts does not treat the law of misappropriation of trade secrets because the Council of the American Law Institute determined that reliance on tort princi-

ples in the field of trade regulation had dimnished as the field has evolved into an independent area of the law. *See* Restatement (Second) of Torts, Introductory Note to Division Nine.

The STP would appear to be the type of "process or device" typically considered a trade secret. It is at the heart of the operation of plaintiff's business and is akin to a formula or pattern. *See* Sabatini Affid. at 28. Further, it is clear that computer software is protectible under the law of trade secrets. *See University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 534 (5th Cir.1974); *Q–Co, supra*, 625 F.Supp. at 617. Finally, the STP confers a competitive advantage on Telerate by permitting it to provide access to its database in a secure and cost effective manner. *See* Affidavit of Richard J. Cowles at 12 ("Cowles Affid."). Even a slight competitive edge will satisfy this requirement of trade secret protection. *See Sheridan v. Mallinckrodt, Inc.*, 568 F.Supp. 1347, 1352 (N.D.N.Y.1983). Nevertheless, defendants contend that the STP is not a trade secret because (1) the STP was not sufficiently "secret," and (2) the STP is not particularly complex and could have been reproduced through reverse engineering. For the reasons set forth below the court disagrees and finds that there is a likelihood that plaintiff will successfully prove that its STP is a trade secret that defendants misappropriated.

■ Defendants contend that STP was not veiled in sufficient secrecy to constitute a trade secret because defendant Caro was not informed the STP was a trade secret, no written confidentiality agreement was executed between Telerate and Caro, and the STP was revealed to various outside parties. Although a trade secret cannot be widely known, *see Ferber v. Sterndent Corp.*, 51 N.Y.2d 782, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980), absolute secrecy is not required. *See Sheridan, supra*, 568 F.Supp. at 1352; *Q–Co, supra*, 625 F.Supp. at 617; *General Aniline & Film Corp. v. Frantz*, 50 Misc.2d 994, 272 N.Y.S.2d 600, 608 (Sup.Ct.1966); *Fairchild Engine and Airplane Corp. v. Cox*, 50 N.Y.S.2d 643 (Sup.Ct.1944). The Second Circuit requires that a trade secret be veiled in sufficient secrecy that " 'except by use of improper means, there would be difficulty in acquiring the information.' " *Q–Co Industries, supra*, 625 F.Supp. at 617 (quoting

*A.H. Emery Co. v. Marcan Products Corp.*, 389 F.2d 11, 16 (2d Cir.), *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968)); *see also Sheridan, supra*, 568 F.Supp. at 1352.

Telerate has taken substantial measures to safeguard the secrecy of the STP that indicate that the STP was a secret, including restricting access to the STP by company employees, enforcing corporate policy against disclosure of trade secrets, and protecting the allegedly secret information by requiring a password to access the computer files as well as physically guarding the computer installation 24 hours a day. *See Delta Filter Corp. v. Morin*, 108 A.D.2d 991, 993, 485 N.Y.S.2d 143, 145 (3rd Dep't 1985). Further, Caro's steadfast denials of knowledge of the secrecy of the STP is curious when it is considered that the document he authored for Telerate, which describes in detail the STP, bears a legend that the information therein contained is proprietary in nature and may not be reproduced without the express consent of Telerate.

■ The defendants also contend that one competent engineer, without guidance, could have discovered within one month the STP by reverse engineering. Defendants cite *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 477, 94 S.Ct. 1879, 1884, 40 L.Ed. 2d 315 (1974) for the proposition that "[t]he ability to use reverse engineering to discover the purported trade secret negates a finding of liability for misappropriation." Defendants' Memo at 58. Defendants mischaracterize the citation to *Kewanee*. The case actually stands for the proposition that the law does not protect the owner of a trade secret from "discovery by fair and honest means such as independent invention, accidental disclosure, or by so-called reverse engineering." *See Kewanee, supra*, 416 U.S. at 476, 94 S.Ct. at 1883. Defendants do not contend, however, that the STP was discovered entirely by reverse engineering; rather, defendants claim that the STP *could have been* discovered by reverse engineering. The *possibility* of discovery by "fair and honest methods" does not preclude the finding of a trade

secret. At best, such possibility is one factor to consider in determining the novelty of the alleged trade secret.

Further, the proper focus of inquiry is not whether an alleged trade secret can be deduced by reverse engineering but rather, whether improper means are required to access it. Plaintiff has restricted access to the STP code by limiting the equipment that could be connected to its datalines. Under the terms of the Telerate Agreement, no equipment capable of reading the SOP can be hooked up without Telerate's consent.

Defendants indicate that a data scope was connected to a customer's data line so that the STP could be obtained. *See* Testimony of Marshall Caro, Tr. at 171. The use of a datascope is in violation of the Telerate Agreement because Telerate Equipment would have to be moved to attach the data scope and the data scope was interfaced with Telerate equipment. *See supra* at 226. The interception of the SOP through an unauthorized hookup of a line monitor is not a proper means of accessing the code. *See Ward v. Superior Court of the State of California,* 3 Comp.L.Rep. 206 (Cal.Super.Ct.1972); *see also United States v. Seidlitz,* 589 F.2d 152 (4th Cir.1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979) (unauthorized phone access to coomputer supports wire fraud conviction where computer source code considered property under statute); *Hancock v. Decker,* 379 F.2d 552 (5th Cir.1967) (conviction for computer program theft under Texas law).

Accordingly, the term "reverse engineering" is not a talisman that may immunize the theft of trade secrets. The relevant inquiry remains whether the means used to obtain the alleged trade secret, including reverse engineering, were proper. It appears that these means were not likely proper in the instant case. The court therefore finds that plaintiff's have demonstrated a likelihood of establishing that the STP is a trade secret that was misappropriated by the defendants.

### E. IRREPARABLE HARM

Plaintiff claims that the use of the Excel–A–Rate program affects the level of performance of other users on the STN. Specifically, plaintiff contends that Excel–A–Rate slows the response time for page requests and in some instances has disrupts services. To support these claims, plaintiff relied on the testimony of an expert in queuing theory. The court accepts the testimony of the expert as representing Excel–A–Rate's potential impact on the Telerate network. According to the expert, the response time would be increased by 20% if two Excel–A–Rate terminals were attached in place of Telerate terminals on a normal 16 terminal party line. *See* Testimony of Dr. Howard Lee Morgan, Tr. at 45. The expert also noted that if one Excel–A–Rate terminal was attached with the automatic page request feature, the response time would be approximately 15 seconds and if two Excel–A–Rate terminals are attached the response time would go up to two minutes. *See id.* at 44. The two minute waiting period would certainly be unacceptable for any person wishing to use the information in the financial markets.

If the use of Excel–A–Rate is not enjoined, there will certainly be a degradation in the performance of the Telerate system. The effect of this degradation of service cannot be compensated in monetary terms and therefore satisfies the irreparable harm prong of the test.

Moreover, plaintiff's copyright claim creates a presumption of irreparable injury. *See e.g., Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Atari, Inc. v. North Am. Philips Consumer Elecs. Corp.,* 672 F.2d 607 (7th Cir.1982), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982); *American Metro. Enterps. v. Warner Bros. Records, Inc.,* 389 F.2d 903, 90 (2d Cir.1968). It is also clear that a preliminary injunction is a proper remedy in cases alleging a tortious interference with contract. *See Sperry & Hutchinson Co. v. Berkeley,* 44 Misc.2d 331, 253 N.Y.S.2d 700, *aff'd,* 22 A.D.2d 762,

254 N.Y.S.2d 231 (1964). Thus, even without the evidence supplied by the expert, it is clear that there is sufficient irreparable harm to satisfy the standard for a preliminary injunction.

## II. DEFENDANTS' CROSS–MOTION

Defendants have cross-moved for a preliminary injunction alleging that Telerate has violated the federal antitrust laws. Specifically, defendants contend that Telerate (1) engaged in an illegal tying arrangement; (2) maintained an illegal monopoly; and (3) attempted to create and maintain an illegal monopoly. The court will now evaluate the likelihood of defendants' success on the merits of these three claims.[12]

### A. TYING CLAIM

The defendants claim that Telerate has committed a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), and Section 3 of the Clayton Act, 15 U.S.C. § 14 (1982), by engaging in an illegal tying arrangement. The elements that will establish that a tying arrangement is per se illegal are:

1. Effect on a "not insubstantial" amount of interstate commerce;
2. A tying and a tied product;
3. Sufficient market power to enable the seller to coerce the buyer to accept the tied product and actual coercion;
4. Anticompetitive effects in the tied market.

*See Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56–57 (2d Cir.1980); *R & G Affiliates, Inc. v. Knoll Intern., Inc.*, 587 F.Supp. 1395, 1398–99 (S.D.N.Y.1984) (Weinfeld, J.).

### 1. *Effect on Interstate Commerce*

██ The requirement that a "not insubstantial" amount of interstate commerce be affected in the tied market is a de minimis requirement. The relevant inquiry is the absolute dollar amount of the goods affected in the tied product market, as opposed to the proportion of the entire product market that the affected goods comprise. *See Fortner Enterps. v. United States Steel Corp.*, 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969). The Supreme Court has held amounts ranging from as little as $60,800 to be "not insubstantial." *See United States v. Loew's, Inc.*, 371 U.S. 38, 49, 83 S.Ct. 97, 104, 9 L.Ed.2d 11 (1962). The Second Circuit has held that $60,000 would definitely meet the substantiality threshold. *See Yentsch v. Texaco*, 630 F.2d 46, 58 (2d Cir.1980). Although the parties have not set forth the dollar amount of commerce affected in the tied product market, it is apparent from the fact that 16,000 Telerate terminals have been installed, *see* Cowles Affid. ¶ 2, that a "not insubstantial" amount of commerce is involved in this case.

### 2. *Two Products*

██ Programit contends that Telerate's STP lines are a tying product and the terminals it provides to its STN customers are a tied product. The court disagrees.

To determine whether two distinct products exist in an alleged tying arrangement, the court should focus on the character of the demand for each product rather than on the function of the products. *See Jefferson Parish Hosp. Dist. No. 4 v. Hyde*, 466 U.S. 2, 19, 104 S.Ct. 1551, 1562, 80 L.Ed.2d 2 (1983). In this case, the demand for Telerate's database cannot readily be distinguished from the demand for the STN terminal.

When customers subscribe to the Telerate service they are purchasing access to the continuously updated database Telerate maintains. The STN service is one of several modes of access that Telerate provides to its database and it is the only one that requires subscribers to use the STN terminal provided by Telerate. *See supra* at 223–224. How the data is displayed cannot be differentiated from the data itself. To the subscriber, the value of the service

---

**12.** Based on the court's finding that plaintiff has made a showing of irreparable harm, the balance of hardships could not tip decidedly in favor of defendants. Accordingly, to prevail on their motion for a preliminary injunction, defendants must demonstrate a likelihood of success on the merits.

is the form of the information a customer receives. In other words, there is no demand for Telerate terminals distinct from the demand for access to the Telerate database.

When a customer subscribes to Telerate STN service, it bargains for a certain output of information at a given price. Excel–A–Rate users obtain benefits not available to regular STN customers because of the enhanced features of Excel-a-rate. Thus, Excel–A–Rate users get a different product than the STN users get—they get more information for their dollar. In fact, this notion was the primary marketing tool employed by Programit. *See, e.g.,* Plaintiff's Ex. 4–7.

Consequently, because the product purchased is information in a particular format, and because the format of the information depends on the display terminal, the court finds that the STN terminal and the Telerate database information are not separate products for antitrust purposes.

### 3. *Market Power and Coercion*

The Supreme Court has stated that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish, supra,* 466 U.S. at 12, 104 S.Ct. at 1558; *see United States Steel Corp. v. Fortner Enterps.,* 429 U.S. 610, 620, 97 S.Ct. 861, 867, 51 L.Ed.2d 80 (1977). Accordingly, not every refusal separately to sell two products is a restraint of trade. Only those refusals to sell products separately that impose an *unreasonable* restraint on trade. Arrangements that meet the characteristics of a per se illegal tie-in are presumptively unreasonable and therefore objectionable under the antitrust law. *See e.g., Arizona v. Maricopa County Med'l Soc'y,* 457 U.S. 332, 342–43, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982) (discussing rationale of per se rule); *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (discussing

areas in which per se rule has been applied); *International Salt Co. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947) (declaring tying arrangements per se illegal).

Coercion is most commonly inferred from what is commonly referred to as "market power"—the ability of a seller to force a buyer to behave on the basis of considerations other than those relevant in a competitive market. In other words, a plaintiff must establish that the purported illegal tying arrangement displaced the usual market forces, such as price, quantity, and quality.

In this case, there is no indication that Telerate has forced its customers to do anything. Although its standard STN contract requires the use of STN terminals, these terminals are not a prerequisite to receiving information from the Telerate database. Telerate provides several modes of access to its database, and STN is the only one that requires the use of an STN terminal. Thus, customers are free to subscribe to a service other than STN if they do not want to lease the Telerate terminal.

Moreover, the STN service may also be used with the customer's own computer, provided that Telerate is informed. *See* Cowles Reply Affid. ¶¶ 16, 17. This service is, however, more expensive than the basic STN subscription. Nevertheless, merely charging a higher price for the tying product is not equivalent to restraining competition in the market for the tied product. *See Jefferson Parish,* 466 U.S. at 13, 104 S.Ct. at 1558. Exploitation of market power to increase the price of the tying product is not necessarily contrary to the competitive goal sought by the Sherman Act, because, presumably, the higher price is justified by some discernible competitive advantage that the tying product has over other products.

Defendants rely heavily on the Ninth Circuit's opinion in *Digidyne v. Data General,* 734 F.2d 1336 (9th Cir.1984), *cert. denied,* 473 U.S. 908, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985). *Data General* involved litigation between rival computer manufacturers. The defendant in that case, Data General,

manufactured a computer system called NOVA, consisting of a central processing unit ("CPU") and a disk operating system called RDOS. The operating system contained the basic commands for operating the system. Data General refused to license the RDOS to all except the purchasers of its NOVA hardware. The Ninth Circuit held that such a refusal was a per se illegal tying arrangement.

The Ninth Circuit focused on the market power and coercion element of a tying arrangement. It concluded that the special attraction of the RDOS, the copyright protection it enjoys, the fact that it is a trade secret, and the fact that purchasers were often locked into the RDOS because of previous investment in application software induced purchasers to choose the NOVA system to give them access to the RDOS based software. Abandoning NOVA would mean scrapping not only the hardware, but the software as well. Consequently, it would have been prohibitively expensive to switch from RDOS, thereby effectively ruling out an abandonment of the NOVA system. Programit's argument consists primarily of analogizing the facts of *Data General* to the facts of the instant case. The analogy, however, is inapposite. The basis for Data General's market power and coercion was its customers' inability to switch systems. In other words, Data General's customers were forced to purchase NOVA CPU's and some peripherals to obtain what they really wanted: the RDOS based software. In the instant case, Telerate does not condition access to its database on the leasing of terminals from it. Rather, Telerate offers a variety of methods of access to its database that provide various formats and options. What Teler-

ate is doing is selling access to its database and it is not promoting sales or leases of computer hardware.

Consequently, the court finds that Programit has not demonstrated a likelihood of success on the merits regarding Telerate's market power or actual coercion on the part of Telerate.

### 4. Anticompetitive Effects in the Tied Market

The requirement that the party claiming an illegal tie-in prove anticompetitive effects in the tied market is essentially a requirement of harm. Because Telerate's "tying" of products is not per se illegal the effects of such "tying" are necessarily not "anticompetitive." Accordingly, this factor need not be further considered at this stage of the case.

### 5. Summary of Tying Claim

Accordingly, the court finds that defendants have failed to demonstrate a likelihood of success on the merits of its tying claim.

### B. MONOPOLY CLAIM

Defendants also allege that plaintiff, Telerate, has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which proscribes monopolization and attempted monopolization.[13] To establish a claim for illegal monopolization, a party must show (1) that the alleged monopolist possesses monopoly power[14] in the relevant market, and (2) that it has the intent to monopolize. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100

---

**13.** Section 2 of the Sherman Act provides in relevant part:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ...

15 U.S.C. § 2.

**14.** A party may establish monopoly power directly or, more commonly, indirectly by demonstrating that the alleged monopolist has a large

share of the relevant product market. The first step in proving market share is the definition of the relevant product market. Defining the relevant market involves determining the various contours of that market; product, geographic area, and time. Further, the party alleging the violation bears the burden of establishing the relevant market. In this case, defendants have failed to carry their burden of establishing what is the relevant market. *See generally* Kintner, Federal Antitrust Law §§ 12.2–12.4.

S.Ct. 1061, 62 L.Ed.2d 783 (1980). Defendants apparently contend that Telerate has unlawfully used its alleged monopoly power in the market for its database[15] to distort competition in a second market, namely the market for terminals that interact with the Telerate system.

*1. Monopoly Power*

The term "monopoly power" only has meaning if applied to a particular market. Defining the relevant market requires, at a minimum, determining the relevant product market and the relevant geographic area of competition. A market definition is necessary to determine whether the alleged monopolist has sufficient market power to meet the "monopoly" threshold. *See United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).

In this case, the defendants first contend that the relevant market is the "provision of computerized data relating to transactions in United States Government securities." *See* Defendants' Proposed Findings of Fact ¶ 46. The defendant bases its assertion that Telerate has monopoly power in this alleged market on three items of evidence. First, defendant cites a Dean Witter research note, *see* Plaintiff's Ex. 1, which concludes Telerate "dominates the U.S. market for its type of service." *See* Defendants' Conclusions of Law at 12. Second, defendants assert that Telerate's marketing officer, Scott Rumbold, agreed to the characterization in the Dean Witter report, thereby admitting that Telerate dominates the United States market. *See* Defendants Ex. 3. Third, defendants contend that Telerate's prospectus and 10K statement filed with the SEC support a finding of monopoly power by indicating that Reuters is the only company with comparable services and it has only a limited market share in the United States.

The court is not convinced that defendants have demonstrated a likelihood of success in establishing that Telerate has monopoly power in the market for "computerized data relating to transactions in United States Government securities," which defendants contend is the relevant market. *See* Defendants' Proposed Findings of Fact ¶ 46. Defendants' reliance on the Dean Witter report, as well as Mr. Rumbold's acquiesence in the conclusions of that report, is misplaced. That report was prepared by Dean Witter to recommend the purchase of Telerate stock. The report does not establish the relevant market within which Telerate operates; rather it was intended as a prognosis of future performance of the company's stock.[16]

In any event, the court does not find the Dean Witter research note to be probative of market power. The document bears a legend stating that the "accuracy or completeness [of the sources of the report] is not guaranteed." Moreover, it cannot be considered an expert opinion because its author has not been qualified as such. Finally, the report was put together to recommend the purchase of Telerate stock, rather than to define the relevant market.

The standard the Supreme Court has enunciated as guiding the determination the parameters of a product market is the "reasonable interchangeability" test first set forth in *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) and more fully developed by subsequent case law. *See United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *International Boxing Club, Inc. v. United States*, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959). The test of reasonable interchangeability comprises consideration of three issues. The first issue is "functional interchangeability"— the degree to which various products are

---

**15.** A complete discussion of the relevant market is set forth below.

**16.** It is amusing to note that the report observes that Telerate "dominates the U.S. market for its type of service" without describing the relevant

market. In the same breath, the report indicates that Merrill Lynch and IBM are introducing a competing financial information service "[that] has certainly exerted a negative influence."

able to perform the same functions. A second aspect to reasonable interchangeability is reactive interchangeability, also known as cross-elasticity of demand, in economic jargon. Simply stated, this concept represents the effect that a change in price of product X has on the demand for product Y. *See e.g., DuPont, supra*, 351 U.S. at 380–81, 76 S.Ct. at 998–99. A third aspect to reasonable interchangeability is supply substitutability—a concept similar to cross-elasticity of demand but applied to the supply side of a market. Supply substitutability refers to the extent to which producers would be willing to shift their resources from production of product X to production of product Y in response to price changes in product market Y, the alleged monopolized market.

The defendants have not attempted to satisfy the reasonable interchangeability test in any way. Rather, as noted above, the defendants, relying on third-party statements regarding market dominance, purported admissions, and Telerate's profits, seek to prove Telerate's monopoly power directly without discussing the relevant market. The defendants support this approach by contending that market definition and analysis is not necessary when "there are no other discoverable facts establishing the existence and degree of market power." *See* Defendant's Proposed Findings Fact at 14 (citing Areeda & Turner, Antitrust Law 330 at ¶ 507 (Vol. II 1978)). The court disagrees.

Defendants have cited Areeda & Turner out of context. If direct proof of monopoly power were practicable, it would be preferable to the market analysis approach. The direct proof Areeda & Turner discuss in their treatise is direct economic proof, namely, demand and supply curves. Direct proof of monopoly power does not mean, however, testimony or physical evidence of opinions regarding the seller's market power. Demand and therefore, cost curves are very difficult to establish accurately, and market analysis provides the most convenient and accurate secondary measure of monopoly power.

In a further attempt to prove directly Telerate's purported monopoly power, defendants cite Telerate's operating income as secondary proof of Telerate's market power.[17] Indeed, one indicium of monopoly power is the reaping of so-called monopoly profits, which are evidenced by returns on capital invested that exceed the returns required to attract capital to that industry or market. In practice, however, such real economic returns on capital are difficult to measure and the proper methods of measuring economic profits are much disputed. *See* Areeda & Turner, *supra*, ¶ 512c at 337. Further, one must be careful not to confuse excess returns on capital with high accounting profits. Accounting profits are affected by accounting conventions regarding depreciation, valuation of assets, and categorization of expenses as current or capital expenses. Consequently, citing accounting profits without more is unsatisfactory proof of monopoly profits, and in turn of monopoly power.

The defendants also contend that Telerate possesses monopoly power in "the market for data terminals and terminal related software that interconnect with its financial market information network." Defendants' Proposed Findings of Fact at 26–27.[18] Defendants base their claims of monopoly power in the peripherals market on their allegations that Telerate possesses monopoly power in the market for provi-

---

**17.** Defendants claim, based on the Dean Witter report discussed earlier, that plaintiff's operating income "exceeded 50%" in 1982, 1983, 1984, and 1985. *See* Defendants' Findings of Fact at 13 ¶ 38. Telerate, by its executive vice-president Richard J. Cowles, claims that its pretax profits are declining and totalled 42% for the fiscal year ending September 30, 1985. *See* Cowles Reply Affid. ¶ 14.

**18.** In their memorandum of law, defendants do not contend that Telerate possesses monopoly power in the market for peripherals that interface with its database; rather, defendants' argument is that Telerate has used its alleged monopoly power in the database market to distort competition in the peripherals market. Nevertheless, in its proposed findings of fact defendants advance the argument that Telerate possesses monopoly power in the peripherals market.

sion of data of United States Government securities. Because this court has already determined that Programit and Caro have failed in their burden of establishing the relevant market for Telerate's service it must necessarily reject the further conclusion that Telerate has monopoly power in the peripherals market. In addition, the defendants have failed to present any evidence that would address the requirements of the Supreme Court's "reasonable interchangeability" test and have, therefore failed to carry their burden with respect to the peripherals market as well.

In summary, it appears that defendants have failed to demonstrate a likelihood of success in establishing, with sufficient definiteness to satisfy the requirements of Section 2 under the relevant case law, the contours of the market in which it claims Telerate possesses monopoly power. Defendants, therefore, have also failed to show that Telerate possesses monopoly power. Accordingly, defendants' claim that Telerate has committed a violation of § 2 of the Sherman Act by unlawfully exercising monopoly power must fail.

### C. ATTEMPTED MONOPOLIZATION

A party asserting a claim of attempted monopolization must prove: (1) specific intent to monopolize; and (2) a dangerous probability of monopolization. *See Times Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953); *Swift v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *Northeastern Telephone Co. v. American Telephone and Telegraph Corp.,* 651 F.2d 76, 85 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).

#### 1. *Specific Intent to Monopolize*

A claim for attempted monopolization requires proof of specific intent to monopolize because as Judge Learned Hand stated:

"[C]onduct falling short of monopoly, is not illegal unless it is part of a plan to monopolize, or to gain such other control of a market as is equally forbidden. To

make it so, the plaintiff must prove what in the criminal law is known as a 'specific intent'; an intent which goes beyond the mere intent to do the act."

*United States v. Aluminum Corporation of America,* 148 F.2d 416, 431–32 (2d Cir. 1945). Proof of such specific intent may be inferred from conduct of the seller, documentation, or industrial background. It may also be proved directly where internal memoranda or statements by employees indicate such a specific intent. *See Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 54–55 (2d Cir. 1979).

Defendants assert that Telerate's conduct demonstrates its intent to monopolize the market for terminals accessing its database. Specifically, defendants note that (1) Telerate changed its protocol in March 1985, which eliminated the ability to keep two pages of data simultaneously updated; (2) Telerate threatened to terminate service to customers who purchased defendants Excel–A–Rate system; (3) Telerate harassed and intimidated defendant Programit's customers with calls from top executives; and (4) Telerate's chairman has threatened to "bury" Programit in expensive and protracted litigation and Telerate's executive vice-president has stated that Telerate would never deal with the defendants. *See* Defendants' Proposed Findings of Fact at ¶¶ 91–94 at 28–29.

The plaintiff, Telerate, has asserted that its actions were prompted by concern for the integrity of its database system. It contends that unrestricted use of the Excel–A–Rate system will lead to unbearable delays in service to the non-Excel–A–Rate customers on each party line. Further, Telerate has presented testimony that it has no intention of entering or competing in the peripheral equipment market and that its main interest is in concentrating on its data dissemination business.

Defendants contend that Telerate instituted the March 1985 change in its protocol merely to disrupt the Excel–A–Rate service. The court finds, however, that Telerate instituted the protocol change for legitimate business reasons. The executive

vice-president of Telerate, Richard J. Cowles, testified that the protocol change was prompted by concern that the updating of multiple pages would unacceptably increase the response time for page requests by customers. Further, defendants contention that the protocol change degraded the Telerate service in order to disrupt the main feature of Excel–A–Rate is untenable. As noted above, Telerate has presented testimony that it is not interested in entering the computer peripherals market. In any event, it is clear that Telerate's primary business and the source of its acknowledged success stems from its database and its reputation for reliability. To conclude that in order to "monopolize" the market for computer terminals with access to its own database, Telerate would degrade its own service is not plausible in light of all the evidence adduced at the hearing. Accordingly, the court does not find that the protocol change supports defendants' allegation of specific intent to monopolize.

The court also finds that the threats to terminate service to those customers that used the Excel–A–Rate service were justified by Telerate's legitimate concern for the performance of its service. Further, Telerate believed in good faith that it was exercising its rights pursuant to what it perceived to be a breach of the service contract, which, under Telerate's interpretation, prohibited the moving of any Telerate equipment. Finally, the court finds that even if the alleged threats to "bury" Programit in a "protracted and complex litigation" were credible, they would be insufficient to demonstrate an intent to monopolize.

Accordingly, the court finds that defendants have failed to demonstrate a likelihood of establishing that Telerate had the specific intent to monopolize the market for computer peripherals connected with its database system.

### 2. *Dangerous Probability of Monopolization*

Dangerous probability of monopolization requires proof of market power in the relevant market sufficient to warrant application of the antitrust laws. This element, like the proof of monopoly power in the related offense of monopolization, is established by analysis of the relevant market. The record is more sparse on the issue of market definition than in defendants' monopolization claim.

Defendants seem to proceed on two theories regarding Telerate's market power. First, defendants contend that Telerate is seeking to "leverage" its monopoly power in the market for "computerized data relating to transactions in United States Government securities," into the market for data terminals and related software. This argument is clearly unavailing as the court has already found that defendants have failed to carry their burden of establishing Telerate's alleged monopoly power in the market for its database. Second, defendants contend that the relevant market is the market for data terminals that connect to a United States Government securities information network. There has been no evidence adduced as to why this is a relevant market or submarket. Moreover, this market definition relies on the market definition for the database, which the court has previously found not to be properly proved by defendants.

The court finds that defendants have also failed in their burden of establishing the "dangerous probability" prong of the attempted monopolization claim. Accordingly, the defendants have failed to demonstrate a likelihood of success on the merits of its attempted monopolization claim.

### SUMMARY

Plaintiff has demonstrated a likelihood of success on the merits of its claims of copyright infringement, misappropriation of trade secrets, interference with contract, and violations of the Telecommunications Act. Plaintiff further will suffer irreparable harm if a preliminary injunction does not issue. Thus, plaintiff has satisfied the requirements for issuance of a preliminary injunction. Defendants have failed to demonstrate a likelihood of success on the merits of their antitrust claims. Consequently,

they have not satisfied the requirements for a preliminary injunction.

### CONCLUSION

For the reasons stated plaintiff's motion for a preliminary injunction is hereby granted and defendants' cross-motion is denied.

SO ORDERED.