In re ALERT HOLDINGS,
INC., et al., Debtors.

ALERT HOLDINGS, INC., the Alert Centre, Inc., Alert Income Partners III, Ltd., and Alert Income Partners IV, Ltd., Plaintiffs,

v.

INTERSTATE PROTECTIVE SERVICES, INC., Tri–Tech Security Inc., the A.C.A. Group, Inc., Raymond S. Campo a/k/a "Dick Young," and James R. Garbarino, Defendants.

Bankruptcy Nos. 91 B 15708 (TLB)–91 B 15711 (TLB) and 92 B 40331 (TLB)–92 B 40337 (TLB).
Adv. No. 92–9044A.

United States Bankruptcy Court, S.D. New York.

Dec. 15, 1992.

Willkie Farr & Gallagher by Michael R. Young and Stewart M. Scott, New York City, for debtors.

Teitelbaum, Hiller, Rodman, Paden & Hibsher by David J. Abrams, New York City, for Alert Income Partners III, Ltd. and Alert Income Partners IV, Ltd.

Bronner and Miller by Bernard Bronner and Gary Miller, New York City, for defendants Interstate Protective Services, Inc. and Raymond S. Campo.

Gregg A. Willinger, New York City, for defendants Tri–Tech Sec., Inc. and The A.C.A. Group, Inc.

## OPINION ON MOTION FOR PRELIMINARY INJUNCTION

TINA L. BROZMAN, Bankruptcy Judge.

The apparent connivery in the alarm monitoring business is remarkable and is said by these debtors, which sell, lease and monitor residential and commercial alarm systems, to truly plague their operations. The debtors, Alert Holdings, Inc., The Alert Centre, Inc., Alert Income Partners III, Ltd., and Alert Income Partners IV, Ltd. (collectively, Alert), seek preliminary injunctive relief to prevent the defendants, Interstate Protective Services, Inc. (Interstate), Raymond S. Campo, Tri–Tech Securities, Inc. (Tri–Tech), and the A.C.A. Group, Inc. (ACA), from surreptitiously stealing, through false claims and advertising, accounts which the defendants previously sold to Alert.[1]

## I.

Different debtors perform different aspects of Alert's business. Alert Holdings, Inc. (Holdings) owns The Alert Centre, Inc. (Centre), an operating company which provides remote electronic monitoring services for business and residential security systems, acquires service contracts for alarm monitoring and leases security systems in homes and businesses. Centre monitors incoming signals from the alarm systems, identifies the nature of the emergency signal and then communicates with the appropriate responding party (fire department, police, etc.).

Through certain subsidiaries, Holdings syndicated a number of partnerships including Alert Income Partners III, Ltd. (AIP III) and Alert Income Partners IV, Ltd. (AIP IV). The partnership debtors acquire alarm accounts by assignment and otherwise, and retain Centre to provide monitoring and administrative services for these accounts pursuant to certain acquisition and monitoring agreements. Each customer pays a monthly monitoring fee to Centre. Centre remits the fees to whichever partnership debtor owns that particular account. The partnership debtors then pay Centre monthly fees for its services.

From October 1989 through May 1991, AIP III and AIP IV purchased 5,489 accounts from Emergency Response Network, Inc. (ERN) for approximately $4.09 million. During that same period, AIP III purchased 378 accounts from Tri–Tech for approximately $238,000. At the times of the purchases, James Garbarino was the president of ERN and Raymond Campo was the president of Tri–Tech. (Campo is also a principal of Interstate, although his precise position is not clear from the record.) AIP III and AIP IV purchased these

---

1. Interstate and Campo had moved to dismiss Alert's complaint, which motion I denied on October 6, 1992. Tri–Tech and A.C.A. made a similar motion but I have not addressed it because the Clerk of the Court entered a default against these defendants for failure to timely answer or move against the complaint.

accounts through "Alarm Account Purchase Agreements" which contained provisions prohibiting the respective sellers from soliciting or competing for the accounts being sold. Such provisions provided in pertinent part that:

> Seller [and James R. Garbarino] shall not in any manner, directly or indirectly, solicit, interfere, compete or take any other action which is designed, intended, or might be reasonably anticipated to have the effect of adversely affecting the Buyer's interest in any Alarm Account or discourage customers or subscribers related to the Alarm Accounts from maintaining the same business relationships with Buyer after the date of this Agreement as were maintained with Seller [and James R. Garbarino] prior to the date of this Agreement ...

The monitoring contracts which Alert purchased from ERN and Tri–Tech have specific periods of duration and are not terminable at will. Typically, they obligate the monitoring company, now, Alert, and customers to perform for periods of one, three, or five years; the contract is renewed automatically unless the customer cancels at the end of a period. Most of the contracts purchased from ERN and Tri–Tech have not expired.

On December 12, 1991, certain of the Alert entities filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code; about a month later, the partnership debtors, including AIP III and IV, filed their own petitions. The day before the first of the Alert petitions was filed, defendant Interstate was incorporated in New York. Interstate, through Campo, thereafter mounted a campaign designed to solicit the customer accounts that ERN had previously sold to Alert. Just how Interstate and Campo obtained access to the customer list for accounts sold to Alert by ERN is not entirely clear from the record, but it would seem that the information must have emanated from ERN and/or Garbarino. Beginning on January 8, 1992, through targeted mailings and phone calls, Interstate began communicating with Alert's customers and notifying them that Interstate would now be servicing their alarm systems. *See, e.g.,* Frank Aff. Exhibit 5. With mass mailings and telephone solicitations, Interstate representatives created the erroneous impression that Alert may be going out of business, is understaffed, is unable to properly monitor the majority of its accounts, had abandoned other accounts, and that AT & T, for which Interstate is an authorized dealer, had "authorized" Interstate to assume Alert's accounts. A few examples may be found in the affidavits of customers Wilmer Hunsicker (was told that Alert was going out of business and that AT & T had designated Interstate to service his account); Karen Smeltzer (was told that Alert was closing its doors because of a pending lawsuit and therefore Interstate would thereafter be servicing her account); Darlene Ellis (who received correspondence and a telephone call from Interstate representatives who sought both to send her documents showing Alert's alleged fraudulent practices, as well as to set up a service appointment to switch her service to Interstate); and Curtis Lemuell (who was told by Interstate representatives that Alert was going out of business and being taken over by Interstate).

Interstate, in its response, does not deny that it utilized this type of advertising, which was patently deceptive, in soliciting Alert's customers. Rather, Interstate argues that the statements it made were mere marketing tools through which Interstate would "carve out a niche for itself." *See* Interstate Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment at 3. To the substantiated charge that some of Alert's customers were uncomfortable with the high pressure tactics employed by Interstate, Interstate suggests that those customers who balked at Interstate's representatives coming to their homes could simply have "called the police to have the Interstate representatives removed." *Id.* at 4. Finally, Interstate claims that it solicited Alert's customers solely because of concern for the customers' safety in light of the number of complaints registered by Alert customers concerning the quality of the service they

had received while customers of Alert. This is highly questionable, however; the majority of customer complaints centered on system breakdowns, which breakdowns were the responsibility of ERN, not Alert, pursuant to Maintenance Agreements it entered into with Alert.

Not too surprisingly, these solicitations bore heavy fruit. Alert calculates that, as of April 10, 1992, it had lost approximately 2,198 of its Alert/ERN accounts. Unwary Alert customers who believed what they had been told invited Interstate representatives into their homes to disconnect Alert's monitoring equipment and "chip-change" these accounts to Interstate. These customers thereafter started receiving duplicate billings from Alert and Interstate. Confused and troubled by what they had been told, several customers spoke with Alert's counsel and recounted their tales.

Alert's counsel, alarmed by what they were learning, began communicating with Alert customers to correct any misconceptions that may have been created through these deceptive solicitations. Interstate countered with another mass mailing to Alert customers in late January or February, 1992, which, aside from inaccurately depicting Alert's financial condition, stated that "Interstate is also willing to provide *free legal representation* to you if you should have a legal problem down the line with 'The Alert Center's' contract. Please be advised that whatever *contract* you have with The Alert Center is probably *not enforceable*. Our attorney's [sic] can better explain to you the details if you desire." (emphasis in original). Smeltzer Aff. Exhibit 2; Tedesco Aff. & Exhibit; Lemuell Aff. Exhibit A. In another correspondence dated March 20, 1992, Interstate warned the customers not to be frightened by the phone calls and letters they received from Alert's counsel. "DO NOT BE FRIGHTENED BY THE ALERT CENTRE IF THEY CALL YOU. ONE OF THEIR TRICKS IS TO FRIGHTEN YOU IF YOU WISH TO CANCEL ... IF YOU SWITCH TO US DON'T LET THEM SWITCH YOU BACK. IF THEY PERSIST IN THREATENING YOU, CONTACT OUR LAWYER." Lemuell Aff. Exhibit A; Smeltzer Aff. Exhibit 4; Geras Aff. & Exhibit.

The attorneys whom Interstate engaged to represent Alert's customers are the firm of Bronner and Miller, which sent out retention letters dated January 21, 1992. Lemuell Aff. Exhibit A. Curiously, at least one affiant swore that she never authorized or consented to her representation by that firm. Rather, Martha Holmes received a letter from Bronner and Miller stating that unless she responded negatively by March 10, her representation by Bronner and Miller would "continue." But this letter was postmarked March 11, one day after the date by which she was to respond negatively. Holmes Aff. ¶ 6 and Exhibits.

Although there is evidence in the record that ACA and Tri–Tech engaged in questionable activities designed to lure Alert's customers prior to the filing of the bankruptcy cases, there is absolutely nothing in the record which indicates that they continued to do so postpetition. (The complaint, which is not verified, alleges a conspiracy that continued postpetition, but on this motion for a preliminary injunction, Alert has not supported those allegations with affidavits or proof of any other sort.) The only connection between the postpetition activities of Interstate, on the one hand, and ACA and Tri–Tech, on the other, is that Raymond Campo is affiliated with each of Interstate and Tri–Tech and Linda Campo, a relative of Raymond Campo, is authorized to receive service of process on behalf of ACA.

On May 5, 1992, Alert commenced this adversary proceeding. In its complaint, Alert seeks injunctive and declaratory relief as well as damages. It alleges claims for violations of the automatic stay, civil contempt, tortious interference with contract, tortious interference with business relations, libel, slander, injurious falsehood, breach of contract, misappropriation and conversion of trade secrets, and unfair competition. Alert has lost more than 89% of its Tri–Tech account base and more than 40% of its ERN account base, losses which Alert argues amount to more than

$600,000/year. Because of its fear of continuing losses and damage to its reputation, which is particularly important to a company in the business of selling security, Alert seeks preliminary injunctive relief against Interstate, Campo, Tri–Tech and ACA, directing the defendants to chip-change the alarm accounts back to Alert and prohibiting them from further solicitation of Alert's customers, from any further acts to take possession of Alert's accounts or otherwise interfere with Alert's business relationships and from further disclosing or using Alert's customer lists.

On October 6, 1992, I entertained oral argument on the motion for a preliminary injunction, none of the parties wishing to adduce oral testimony. Numerous affidavits were submitted. Although defendants Tri–Tech and ACA had had a default entered against them, they have moved to vacate that default; with the concurrence of Alert's counsel, I entertained their objections to the preliminary injunction motion. Joined by the other defendants they argue that Alert has failed to demonstrate either irreparable harm or a likelihood of success on the merits.

## II.

■ The standards set forth by the Second Circuit for the issuance of a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, require that the party requesting preliminary relief demonstrate both irreparable harm and either (1) a likelihood of success going to the merits or (2) a sufficiently serious question regarding the merits to make it a fair ground for litigation, with the balance of hardships tipping decidedly in its favor. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir.1989); *Kaplan v. Bd. of Educ.*, 759 F.2d 256, 259 (2d Cir.1985); *Local 553, Transport Workers v. Eastern Air Lines*, 695 F.2d 668, 675 n. 5 (2d Cir. 1982). Case law in this district has established a limited exception to the irreparable harm requirement for issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that

threatens the reorganization process or which would impair the court's jurisdiction with respect to a case before it. *LTV Steel Company, Inc. v. Bd. of Educ. (In re Chateaugay Corp., Reomar, Inc.)*, 93 B.R. 26, 29 (S.D.N.Y.1988), citing *In re Neuman*, 71 B.R. 567, 571 (S.D.N.Y.1987); *accord AP Industries, Inc. v. SN Phelps & Co. (In re AP Industries, Inc.)*, 117 B.R. 789, 802 (Bankr.S.D.N.Y.1990). Where there is a showing that the action sought to be enjoined would embarrass, burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the debtor's estate and reorganization prospects, the Bankruptcy Court may issue injunctive relief. *In re Chateaugay Corp., Reomar, Inc.*, 93 B.R. at 31, *citing In re Investors Funding Corp.*, 547 F.2d 13, 16–17 (2d Cir.1976). The record developed demonstrates that the requirements for issuance of a preliminary injunction have been met with respect to defendants Interstate and Campo.

### (A) Irreparable Harm

■ Irreparable harm exists where there is a continuing wrong which cannot adequately be redressed by final relief on the merits. Such harm is often found where money damages cannot provide adequate compensation. *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990); *Eastern Air Lines, Inc. v. International Association of Machinists & Aerospace Workers, AFL–CIO ("IAM") (In re Ionosphere Clubs, Inc.)*, 108 B.R. 901, 947 (Bankr.S.D.N.Y.1989). Harm to the debtor's operations, reputation and goodwill is considered "irreparable." *Id.* at 947 ("Here, defendants' persistent resort to illegal conduct, directed at Eastern and its employees, contractors, customers and others having business with Eastern, has manifestly caused irreparable harm to Eastern, its operations and goodwill."); *cf. Telerate Systems, Inc. v. Caro*, 689 F.Supp. 221 (S.D.N.Y.1988); *Ecolab, Inc. v. Paolo*, 753 F.Supp. 1100, 1110 (E.D.N.Y.1991). Moreover, the use and disclosure of confidential customer information with the accompanying potential loss of customers is considered irreparable harm. *Ecolab, Inc. v. Paolo*, 753 F.Supp. at 1110; *Velo–Bind*,

*Inc. v. Scheck,* 485 F.Supp. 102, 107–109 (S.D.N.Y.1979).

### 1. *Monetary Damages Inadequate*

The defendants suggest that Alert has done no more than pray for monetary relief in its pleadings, as a result of which no injunctive relief is warranted. I disagree, for Alert has shown that it has suffered substantial losses from the defendants' actions as well as injury to its reputation, goodwill and customer relations and that, at least with respect to defendants Interstate and Campo, the losses and injury are likely to continue. Particularly injurious in the context of a chapter 11 case is the false impression that the debtor is no longer conducting or able to staff its business.[2]

### 2. *Alert "Dragged Its Feet"*

██ Citing *Lavin Inc. v. Colonia, Inc.,* 739 F.Supp. 182 (S.D.N.Y.1990), the defendants argue that a preliminary injunction motion must be denied if the movant, by delaying in seeking such relief, demonstrates that there is no need for speedy action. Preliminary injunctions involve an urgent need for speedy action to protect the movant's rights. *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985). A delay, even if it does not rise to the level of laches, demonstrates a lack of need for speedy action. *Lavin Inc. v. Colonia, Inc.,* 739 F.Supp. at 192. But Alert did not delay in bringing this preliminary injunction motion. Account raiders do not announce their intentions or the results of their actions. The nature of Alert's business is such that it simply monitors unpaid customer accounts until those accounts remain unpaid for sixty days. At that point Alert typically investigates the reason why the accounts are delinquent.

██ Not until after Alert first sought bankruptcy protection in December, 1991 did it observe an increasing pattern of delinquency among the customer accounts purchased from ERN. There is no ques-

tion but that Campo's aggressiveness increased when Alert sought chapter 11 relief. Once Alert suspected the magnitude of what was occurring postpetition and that a threat to its reorganization existed, it immediately dispatched a representative to investigate and compile affidavits, produced these affidavits during April and filed its adversary complaint on May 5th. Alert was given July 13th as a hearing date, and that hearing date was adjourned to August 18th on request of the parties, who were in the midst of settlement negotiations. At defendants' request, the August 18th hearing date was adjourned as well. Thus, I cannot conclude that Alert "sat on its rights." Rather, it proceeded in a timely fashion.

### 3. *Interstate and Campo's Offer*

Interstate and Campo have offered to stop their practice of "knowingly taking accounts," which they say means that Alert will not suffer irreparable harm if no injunction is granted.

Although Alert does seek injunctive relief prohibiting the defendants from "knowingly taking" Alert's accounts, the offer makes no mention of the equally pressing problem facing Alert, namely, that Interstate and Campo may continue to spread patently misleading information concerning Alert's financial condition and ability to continue adequately servicing its accounts. In the end, the conclusion is inescapable that Alert has suffered and will continue to suffer irreparable harm if injunctive relief is not granted.

### (B) Likelihood Of Success Going To The Merits Or A Sufficiently Serious Question Regarding The Merits To Make It A Fair Ground For Litigation With The Balance Of Hardships Tipping Decidedly In The Movant's Favor.

### 1. *Automatic Stay Violation*

Tri–Tech and ACA argue, quite persuasively, that they have not violated the auto-

---

**2.** Tri–Tech and ACA have also contended that the number of accounts which they are said to have stolen prepetition is too insignificant in the context of these cases to constitute the magnitude of injury sufficient to warrant injunctive relief. Because I have concluded that these

defendants have not been shown to have violated the automatic stay of section 362, and therefore, that Alert is not likely to suffer any further injury which would, at this time, warrant injunctive relief, it is not necessary to address this argument.

matic stay. Given that Alert has not shown them to have acted detrimentally to Alert postpetition, those defendants are correct. The conclusion is quite to the contrary with respect to Campo and Interstate, however.

The ERN alarm system accounts, Campo and Interstate posit, are still executory in that the debtors have not yet assumed or rejected them. Therefore, the argument runs, these contracts should not be considered property of the estate and are not afforded the protections of the automatic stay. Thus, the argument concludes, Alert has no chance of success on the merits insofar as it claims violations of the automatic stay. To this end Campo and Interstate cite *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir.1991).

Fortunately, the slate on which I write is covered with the writings of others. Very recently, Judge Conrad, sitting in this district by designation, held that an executory contract is property of the estate subject to the reach of the automatic stay. *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 702 (Bankr.S.D.N.Y. 1992). Years earlier, in *48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427, 430 (2d Cir.1987), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988), the Second Circuit determined that an unexpired lease of real property was property of the estate protected by the automatic stay.[3] *See also Official Committee of Unsecured Creditors v. PSS Steamship Company, Inc. (In re Prudential Lines, Inc.)*, 928 F.2d 565, 574 (2d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 82, 116 L.Ed.2d 55 (1991). To similar effect is *In re Computer Communications, Inc.*, 824 F.2d 725 (9th Cir.1987), holding that a creditor's unilateral termination of a contract which contained a bankruptcy default clause contravened the automatic stay because the executory contract was property of the estate. These

cases are appealing in light of the scope of section 541, which gathers into the estate "all kinds of property, including tangible or intangible property." *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2314, 76 L.Ed.2d 515 (1983); *Cohen v. Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 701; *In re Chateauguay Corp.*, 116 B.R. 887, 898 (Bankr.S.D.N.Y. 1990); *Matter of Fugazy Exp., Inc.*, 114 B.R. 865, 869 (Bankr.S.D.N.Y.1990), *aff'd*, 124 B.R. 426 (S.D.N.Y.1991); *In re Beker Indus. Corp.*, 57 B.R. 611, 622 (Bankr. S.D.N.Y.1986).

The only real arrow which Campo and Interstate shoot is the Ninth Circuit's later decision in *Qintex*. There, a debtor sought to transfer certain executory contracts before the contracts had been assumed. The Ninth Circuit held that an executory contract is not property of the estate until assumed and, therefore, cannot be transferred until it has first been assumed. 950 F.2d at 1495. (Of course, the Ninth Circuit could have reached the very same result just by invoking section 365(f)(2)(A) of the Code, which declares that the trustee may assign an executory contract only if the trustee assumes the contract in accordance with the provisions of section 365.) *Qintex* is bottomed on a line of cases in the Ninth Circuit born from a case decided under the former Bankruptcy Act, *Cheadle v. Appleatchee Riders Association (In re Lovitt)*, 757 F.2d 1035 (9th Cir.1985), *cert. denied*, 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985). In *Lovitt*, a trustee failed to discover within 60 days of the filing of the petition certain mineral leases which the debtor had not listed in its schedules of property. The case was closed. Thereafter it was reopened and a successor trustee learned of the leases, did not move to assume them, and sold her interest in the leases without warranty. The bankruptcy court confirmed the sale but was reversed by the district court. The Ninth Circuit affirmed the district court, reason-

---

**3.** This conclusion is supported by section 362(b)(10) which exempts from the reach of the automatic stay leases of nonresidential real property which have terminated by operation of law. If those leases are carved out from the automatic stay, then it follows that unexpired leases (and contracts) must be included within the protective embrace of the automatic stay.

ing that the executory contracts do not vest in the trustee as of the date of the filing of the petition, but only upon the trustee's timely assumption of them. *Id.* at 1041. (Under section 70(a) of the Bankruptcy Act, the trustee was vested with title to property of the estate; under the Code, that is not so. Instead, an estate is created under section 541.)

Once before I had occasion to consider whether the rationale in *Lovitt* is still appropriate under the Code. I concluded then, as I do now, that under the Code an executory contract is property of the estate protected by the automatic stay. *In re THW Enterprises, Inc.*, 89 B.R. 351, 354 (Bankr.S.D.N.Y.1988). I determined that the better rationale was that espoused by the Supreme Court in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), that is, that an executory contract is property of the estate but is unenforceable against the estate unless and until assumed.

Just as executory contracts are property of the estate, so, too, are accounts receivable, rights of action to recover accounts receivable and intangibles such as customer lists and goodwill. *See Crysen/Monte-* *nay Energy Co. v. Esselen Associates, Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1101 (2d Cir.1990) (right to recover accounts receivable); *Elscint, Inc. v. First Wisconsin Financial Corp. (In re Xonics, Inc.)*, 813 F.2d 127, 131 (7th Cir. 1987) (accounts receivable); *Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129, 131 (2d Cir.1984) (causes of action); *Debreceni v. Bru–Jell Leasing Corp.*, 710 F.Supp. 15, 21 (D.Mass.1989) (intangibles such as customer lists and goodwill).

Campo and Interstate do not dispute that they solicited accounts postpetition which Alert had purchased from ERN [4], and the record plainly establishes that they utilized Alert's customer list and attempted to harm its goodwill, all with the aim of obtaining possession and exercising control over property which is property of the estate. 11 U.S.C. § 362(a)(3). Accordingly, the conclusion is virtually inescapable that they have violated the automatic stay.

### 2. *Tortious Interference With Business Relations* [5]

The defendants next argue that there is little likelihood of success because the com-

---

**4.** What they contend is that Alert's interest in these alarm accounts has been extinguished. I find each of their arguments unpersuasive.

The first of these arguments is the one which I have just rejected, that executory contracts are not property of the estates. Interstate and Campo also suggest that the Alert entities materially breached their obligations under the two alarm account purchase agreements. Accordingly, Interstate and Campo say, ERN properly foreclosed its security interests under the agreements. Assuming, *arguendo,* that Alert had breached its obligations under the alarm account purchase agreements, Interstate and Campo's arguments are nonetheless flawed. First, ERN has filed a proof of claim, alleging a security interest in the debtors' property. Had it foreclosed prepetition, it would not have needed to file such a claim. Moreover, none of Garbarino, Interstate or Campo has provided any documentation suggesting that ERN proceeded properly to foreclose prepetition. Had ERN foreclosed postpetition, such foreclosure would have required relief from the automatic stay, relief which ERN has not sought. In addition, the very terms of the security agreements that accompanied the alarm purchase agreements make clear that the secured party would not be permitted to accelerate the debt and foreclose should senior debt

(including bank and institutional debt) exist at the time of default.

Finally, I find no merit to Interstate and Campo's suggestion that the Alert entities materially violated the monitoring contracts by filing Chapter 11. As section 365 of the Code makes clear, such "bankruptcy forfeiture" clauses are unenforceable to support termination of a contract.

**5.** The discussion that follows presupposes that New York substantive law applies. Such a presumption arises because the defendants, both in their objection papers and at the hearing, based their arguments on interpretations of New York law. At no time did they raise the issue of the applicability of another state's law.

Nonetheless, insofar as Alert has asserted claims for tortious interference, libel and slander, application of Pennsylvania law (the only other state whose law might apply) would not alter my conclusions. As the Third Circuit Court of Appeals noted earlier this year, both New York and Pennsylvania have adopted the Restatement (Second) of Torts. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1381 and n. 17 (3d Cir.1992). Thus, the standards for tortious interference with business relations, governed by Restatement (Second) of Torts § 766B (1977), the standards

plaint does not even properly plead the requirements for tortious interference with business relations. It fails, they say, to allege that the defendants' sole motive in interfering was to inflict injury.

■ To prevail on a claim for tortious interference with prospective business relations, a plaintiff must demonstrate that the defendant interfered with business relations existing between a plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are dishonest, unfair, or improper. *Volvo N. Amer. Corp. v. Men's Intern. Pro. Tennis Coun.*, 857 F.2d 55, 74 (2d Cir.1988); *PPX Enters. v. Audiofidelity Enters.*, 818 F.2d 266, 269 (2d Cir.1987). Alert has pleaded tortious interference with prospective business relations properly. In almost one-third of the complaint's numbered paragraphs, beginning with the first, it alleges that the defendants undertook fraudulent and dishonest practices designed to unfairly solicit Alert's customers. The record thus far developed demonstrates that Alert is likely to succeed on this claim.

### 3. *Trade Secrets*

Defendants next argue that Alert is unlikely to succeed on its claim for conversion of trade secrets because the Alert customer lists in question are not trade secrets which may be protected.

■ The question of whether or not a customer list is a trade secret is generally a question of fact. *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir.1991). The answer depends in part on subsidiary fact questions of whether or not the owner took reasonable measures to protect the secrecy of the list. *Id.; Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1063 (2d Cir.), *cert. denied*, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); and the ease of difficulty with which the information could be properly obtained from other sources. *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d at 89. A list which is developed through

substantial effort and kept in confidence will be considered a trade secret, assuming the information it contains is not otherwise readily available. *Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d at 1063.

It was these very lists which Alert was purchasing, in essence, when it purchased the alarm monitoring accounts from defendants. Alert paid over $4 million for the right to contract exclusively with the customers whose names appeared on those lists. In its complaint, Alert alleges that these lists were neither public nor a matter of public knowledge, improperly converted by defendants for their own use without Alert's consent, and were used by defendants to solicit Alert's customers after Alert filed for relief under chapter 11. The affidavits and exhibits establish that Alert was purchasing customer lists, that the lists were proprietary, that Alert did not consent to their use by any of the defendants and that Alert took precautions to protect the secrecy of those lists, as evidenced by the anti-competition clauses. Hence, I am persuaded that Alert is likely to prevail in its claim that the customer lists were protected trade secrets.

### 4. *Tortious Interference With Contract*

The defendants next argue that Alert is not likely to succeed on the merits with respect to their tortious interference with contract claim both because the claim fails to plead "but for" causation, as they suggest is required under the Second Circuit's ruling in *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1109, 113 L.Ed.2d 218 (1991), and because the complaint fails to plead actual malice.

■ To maintain a successful cause of action for tortious interference with contract under New York law, a plaintiff must show that there existed a valid contract between the plaintiff and another of which

for tortious interference with contract, governed by Restatement (Second) of Torts § 766 (1977), and the standards for defamation, governed by Restatement (Second) of Torts §§ 569, 570 (1977) are the same whether I utilize Pennsylvania or New York law.

the defendant had knowledge, intentional interference with that contract without justification and damages. In addition, many courts have required the plaintiff to show that but for the unlawful actions of the defendants the contract would have been performed. *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d at 828; *International Minerals & Resources, Inc., v. Pappas*, 761 F.Supp. 1068, 1075 (S.D.N.Y. 1991); *Merrill Lynch Futures, Inc. v. Miller*, 686 F.Supp. 1033, 1040 (S.D.N.Y.1988); *GLM Corp. v. Klein*, 665 F.Supp. 283, 287 (S.D.N.Y.1987); *Demalco, Ltd. v. Feltner*, 588 F.Supp. 1277, 1280 (S.D.N.Y.1984); *Special Event Entertainment v. Rockefeller Center, Inc.*, 458 F.Supp. 72, 78 (S.D.N.Y.1978); *Bryce v. Wilde*, 39 A.D.2d 291, 333 N.Y.S.2d 614 (3d Dep't), *aff'd*, 31 N.Y.2d 882, 340 N.Y.S.2d 185, 292 N.E.2d 320 (1972); *Williams & Co. v. Collins, Tuttle & Co.*, 6 A.D.2d 302, 306, 176 N.Y.S.2d 99, 102 (1st Dep't 1958). Whether the claim arises in interference with the formation of the contractual relationship or in interference that causes a breach of an existing contract, the causation link is required. *See also* 72 N.Y.Jur.2d, *Interference*, §§ 5, 12 at 204–212 (1988).

Alert argues that such a "but for" requirement is not applied in this Circuit and cites *Telerate Systems, Inc. v. Caro*, 689 F.Supp. at 225 as support. *Telerate* derived its formulation from that given by the Second Circuit in *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 75 (2d Cir.1986), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986), which derived its formulation from the criteria provided by the New York Court of Appeals in *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 99 (1956). In *Israel*, New York's high court embraced a test for tortious interference with contractual relations which embodied the following elements: (1) a valid contract between the plaintiff and another, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procuring of the breach of that contract, and (4) damages. The decision does not discuss the "but for" causation which the New York Court of Appeals later endorsed in *Bryce*.

I have found Second Circuit decisions written both before and after *Sharma* which discuss tortious interference with contract without addressing this "but for" requirement. *See Jews for Jesus, Inc. v. Jewish Comm. Rel. Council of N.Y., Inc.*, 968 F.2d 286, 292 (2d Cir.1992); *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 541 (2d Cir.1989). Both these cases derive the requirements for tortious interference with contractual relations from the New York Court of Appeals' decision in *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189–90, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). However, a close reading of *Guard–Life* reveals that the Court of Appeals was focused on the nature of the contractual relationship with which there was alleged interference. Recognizing that the law in this area has "not fully congealed but is still in its formative stages," the Court of Appeals concluded that a defendant had to induce or otherwise cause the third person not to perform the contract in order to properly plead tortious interference with contract. 50 N.Y.2d at 190, 428 N.Y.S.2d at 631–32, 406 N.E.2d at 448. That opinion did not expressly denounce the "but for" test that *Bryce* had earlier espoused.

▮ Alert's complaint fails to allege that the harm would not have occurred but for the defendants' actions. In light, however, of the uncertainty in the cases as to the proper standard to apply[6], Alert has shown fair grounds for litigation.[7] (That

---

6. *See, e.g., Sommer v. PMEC Associates & Co., Ltd.*, 1992 WL 196748 at *4 (S.D.N.Y. August 5, 1992).

7. Contrary to the defendants' argument, "the requirement of actual malice, as an element in the tort of inducing breach of contract, has now been abandoned. At present, one who, having knowledge of a contract, and without reasonable justification or excuse, induces one of the parties to break the contract, by reason of which the other party sustains damage, commits an act which is malicious." 72 N.Y.Jur.2d *Interference* § 11 at 211–12.

the balance of hardships tips in its favor is clear. Alert's continued existence is jeopardized by the actions of Interstate and Campo taken in apparent violation of the automatic stay. There was staged here a campaign to undercut Alert's ability to conduct its business under the aegis of this court. Interstate and Campo, on the other hand, have not demonstrated any entitlement whatsoever to ownership of these accounts.)

### 5. Libel/Slander

Interstate and Campo next argue that both of Alert's libel and slander causes of action have no likelihood of success on their merits. Specifically, they suggest that the written statements sent to Alert's customers were not susceptible of a defamatory connotation. Moreover, they claim that Alert has not pleaded special damages with respect to its slander claim. I find both arguments unpersuasive.

Defamation, whether by libel or slander, is an injury to the person and to one's reputation—that is, to one's right to enjoy the good opinion of others. 43 N.Y.Jur.2d *Defamation and Privacy* § 1 at 497. A libel is a publication, expressed in printing or writing, which is false and tends to injure one's reputation and thereby exposes him to public hatred, contempt, scorn, obloquy or shame. *Id.* A plaintiff suing in libel need not plead or prove any special damages if the defamatory statement "tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induces an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Matherson v. Marchello*, 100 A.D.2d 233, 236, 473 N.Y.S.2d 998, 1001–02 (2d Dep't 1984) (citations omitted).

As the facts make quite clear, both Interstate and Campo disseminated patently false and misleading written statements concerning Alert's financial condition to Alert's customers. Contrary to the print Interstate and Campo provided, Alert was neither going out of business, nor were Interstate and Campo authorized by AT & T to take over Alert's customer accounts.

The charge of Alert's harassing its customers was also misleading. All these statements were designed to create a poor opinion of Alert in the minds of its customers. Hence, Alert is likely to succeed on the merits with respect to the libel cause of action.

Insofar as Interstate and Campo allege that Alert has failed to plead special damages, they are again incorrect. A plaintiff suing in slander ordinarily must plead special damages unless the defamation falls into one of four per se categories. *Matherson v. Marchello*, 100 A.D.2d at 236, 473 N.Y.S.2d at 1001; Prosser, *Torts* [4th ed.], § 112 at 751–760; Restatement (Second) of Torts § 570 (1977). Those categories include defamation that tends to injure the plaintiff in his or her trade, business or profession. *Matherson v. Marchello*, 100 A.D.2d at 236, 473 N.Y.S.2d at 1001.

The comments made by the Interstate and Campo's representatives unquestionably could have injured Alert's business by casting a false light on Alert's ability to service its alarm accounts. Thus, I find that Alert is likely to succeed on the merits with respect to its slander cause of action.

### (C) The Scope Of Appropriate Relief

Alert has demonstrated irreparable harm if the acts of Interstate and Campo continue. Over 40% of the Alert/ERN account base and over 89% of the Alert/Tri-Tech account base has been lost as a result of the defendants' acts, causing an annual loss of revenue in excess of $600,000. Of even greater concern is the fear that this practice will continue while Alert's reputation, goodwill and customer relations continue to be irreparably tarnished due to defendants' dissemination of false and misleading information to Alert's customers. Should I decline to grant this injunctive relief, not only could the defendants continue these practices, but I would be sending a signal to all those who may also attempt to "raid" Alert's alarm accounts that the court is powerless to prevent this type of harm. Accounts would continue to be siphoned off. Continued loss of business reputation and revenue would foreclose

any likelihood that Alert could successfully reorganize.

Were there any evidence with respect to a continuing threat posed by Tri–Tech and ACA, I might have concluded that irreparable harm exists with respect to them as well. But given that the other defendants have not been shown to have engaged in any conduct postpetition which threatens the reorganization or which will adversely affect Alert's business, I cannot leap to the conclusion that they will disobey or attempt an end run around the automatic stay.

Alert has demonstrated a likelihood of success at trial at least with respect to Interstate and Campo. (Because I have concluded that Alert has not shown irreparable harm with respect to Tri–Tech and ACA, it is not necessary to consider whether Alert has demonstrated a likelihood of success in its claims against them.) Hence, I conclude that a preliminary injunction is warranted.

I am bound to give careful consideration to the scope of the injunction. To the extent that Alert seeks to enjoin Interstate and Campo from making future false and misleading statements to present or former customers of Alert, from communicating with present customers in order to induce them to break their contractual or business relationships with Alert, from billing or seeking collection from present customers of Alert and from further disclosure or use of Alert's proprietary information to solicit or take possession of Alert's accounts, the injunction is warranted.

Alert also asks for a mandatory injunction directing all the defendants to chip-change the former Alert accounts back to Alert. I am not unmindful that a court must be particularly circumspect in considering whether to grant mandatory relief. *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 441 (2d Cir.1977). Mandatory injunctive relief is appropriate in the face of extreme or very serious damage. *Lavin Inc. v. Colonia, Inc.*, 739 F.Supp. at 192; *Clune v. Publishers' Association*, 214 F.Supp. 520, 531 (S.D.N.Y.), *aff'd*, 314 F.2d 343 (2d Cir.1963). But only days ago the Second Circuit confirmed that acts taken in violation of the automatic stay are generally void. "Indeed, so central is the § 362 stay to an orderly bankruptcy process that 'actions taken in violation of the stay are void and without effect.'" *FDIC v. Hirsch (In re Colonial Realty Company)*, 980 F.2d 125, 137 (2d Cir.1992) (quoting *48th Street Steakhouse*, 835 F.2d at 431, in turn quoting 2 L. King, *Collier on Bankruptcy*, ¶ 362.11 (15th ed. 1987)). Alert has shown not only that it is likely to succeed on most of its claims, but also that Interstate and Campo paid no heed to the automatic stay. Under the circumstances, I believe that Alert has demonstrated the very serious damage which warrants mandatory relief. Interstate and Campo are directed to deposit in escrow with the debtor's counsel pending the trial of this matter any monies which are received after entry of an order consistent with this decision in payment of accounts which were chip-changed postpetition. The denial of injunctive relief with respect to the other defendants is without prejudice; should it appear that any of them violates the automatic stay or engages in conduct which, if it were to continue, would cause irreparable harm to Alert, Alert may seek further relief.

SETTLE ORDER CONSISTENT WITH THIS OPINION.